**GULF OIL CORPORATION, Defendant-Appellant and Cross-Appellee,**

**v.**

**Richard W. DYKE, dba Western Stations Co., Colvin Oil Company, and F.O. Fletcher, Inc., dba Fletcher Oil Company, Plaintiffs-Appellees and Cross-Appellants,**

**United States of America, Intervenor.**

**Nos. 9–80, 9–81.**

Temporary Emergency Court of Appeals.

Argued March 19, 1984.

Decided April 17, 1984.

Jack D. Fudge and Michael L. Hickok, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., on the brief for appellant/cross-appellee.

John L. Schwabe and Neva T. Campbell, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., on the brief for appellees/cross-appellants.

John R. Knight, Edward T. Cotham, Jr. and Bradley Ford Stuebing, Gulf Oil Corporation, Houston, Tex., on the brief for appellant/cross-appellee.

Larry P. Ellsworth, Asst. General Counsel, David Engels and Marcia K. Sowles, Dept. of Energy, and Richard K. Willard, Acting Asst. Atty. Gen., Anthony J. Steinmeyer and Douglas Letter, Attys., Dept. of Justice, Washington, D.C., on the brief for the United States.

William H. Bode, John E. Varnum and Tobey B. Marzouk, Spriggs, Bode & Hollingsworth, Washington, D.C., on the brief for amici curiae, Independent Oil and Tire Co., Shepherd Brothers Service Stations, and U.S. Oil Co., Inc.

John A. Evans, Marathon Petroleum Co., Findlay, Ohio, William C. Streets and Gail F. Schulz, Mobil Oil Corporation, Fairfax, Va., R. Bruce McLean, P.C., Daniel Joseph, P.C., Warren E. Connelly, P.C., and David A. Holzworth, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., on the brief for amici curiae, Marathon Petroleum Co. and Mobil Oil Corp.

Before CHRISTENSEN, ESTES and ZIRPOLI, Judges.

ESTES, Judge:

This is an action for overcharges under § 210(b) of the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note, as incorporated in the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. § 751 et seq. brought by Plaintiffs-Appellees and Cross-Appellants Richard W. Dyke, dba Western Stations Co., Colvin Oil Company, and F.O. Fletcher, Inc., dba Fletcher Oil Company (hereinafter "Dyke" when referred to collectively; "Richard W. Dyke" when referring to plaintiff Dyke singularly), against Defendant-Appellant and Cross-Appellee Gulf Oil Corporation (hereinafter "Gulf").[1] Gulf also filed a counterclaim for unpaid bills for gasoline in the sum of $728,753.78 against Richard W. Dyke only,[2] which was not contested.[3] Dyke alleged that Gulf overcharged it in sales of gasoline from Gulf to Dyke between January 1974 and January 1977. An Amended Judgment entered on September 12, 1983 [4] in the United States District Court for the District of Oregon was awarded to plaintiffs against Gulf in amounts as follows:

---

[1.] Independent Oil and Tire Co., Shepherd Brothers Service Stations and U.S. Oil Company, Inc. have filed a joint brief as *Amici Curiae* on the prejudgment interest and attorneys' fees questions presented by this appeal.

[2.] Record at Vol. 1, Tab 2.

[3.] Record at Vol. 1, Tab 3, p. 1.

[4.] Record at Vol. 11, Tab 161. The Original Judgment entered August 25, 1983 (*Id.* at Tab 157) and first Amended Judgment entered August 26, 1983 (*Id.* at Tab 158) were set aside by Order of September 2, 1983 (*Id.* at Tab 160).

| | Overcharges | Prejudgment Interest | Attorney's Fees |
|---|---|---|---|
| Richard W. Dyke, dba Western Stations Co. | $1,264,555.22 | $ 557,588.38 | $ 385,500 |
| Colvin Oil Company | 745,000.00 | 200,568.99 | 173,500 |
| F. O. Fletcher, Inc., dba Fletcher Oil Company | 790,000.00 | 408,471.69 | 191,000 |
| | $2,799,555.22 | $1,166,629.06 | $ 750,000 |

In addition to the $4,716,184.28, total of the above sums, the Amended Judgment also awarded costs and post-judgment interest to plaintiffs at the rate of 10.58 percent against Gulf. Gulf appeals from this judgment. Dyke has filed a cross-appeal contending the district court incorrectly computed the prejudgment interest which Dyke was awarded.

In October of 1972, Gulf's board of directors decided to divest Gulf of all its marketing activities in its San Francisco Retail Marketing District, which included northern California, northern Nevada, Oregon and Washington. The decision to divest followed losses by Gulf of $31.7 million in 1971 and $37 million in 1972 in the Northwest.[5] The passage of the EPAA, however, forced Gulf to continue to supply its customers in the area and to place its purchasers into classes which would maintain the customary price differentials in existence on May 15, 1973.[6] Gulf continued to supply all of its jobber customers in the area, but converted all of the branded jobbers[7] to unbranded jobbers on January 1, 1974. Before 1974, Gulf had supplied only one jobber in the district on an unbranded basis.[8]

On May 15, 1973, Richard W. Dyke, Colvin, and Fletcher all purchased gasoline from Gulf as resellers-retailers as defined in 10 C.F.R. § 212.31. Gulf was a refiner as defined in the same section. Richard W. Dyke and Colvin were among those purchasers who were branded jobbers on May 15, 1973 and converted to unbranded jobbers on January 1, 1974.

The other jobbers in the district who were reclassified from branded to unbranded on January 1, 1974, were placed in the Armour class of purchaser to reflect their new status. Richard W. Dyke and Colvin, however, were given base prices reflecting those published in *Platt's Oilgram* for May 15, 1973 for Portland and Eugene, Oregon and Seattle/Tacoma, Washington. Gulf reasoned that its jobbers in Oregon and Washington comprised a substantially different market from those in northern California and should constitute a separate class with a different base price. Gulf relied on the new item/new market rule[9] to justify its use of *Platt's Oilgram* in establishing a base price for Richard W. Dyke and Colvin, which is an exception to the rule that base prices must correspond to a

5. Findings of Fact and Conclusions of Law ("FFCL"), Record at Vol. 11, Tab 147, pp. 4–5.

6. 10 C.F.R. § 212.

7. Gulf's branded jobbers received free painting of service stations, hauling allowances and the privilege of honoring Gulf credit cards. FFCL, *supra,* at 4. Dyke and Colvin were Gulf branded jobbers before January 1, 1974. *Id.*

8. FFCL, *supra,* at 5–6. The unbranded jobber was Armour Oil Co., which purchased gasoline

from Gulf's northern California terminals only. *Id.*

9. FFCL, *supra,* at 11. The new item-new market rule, 10 C.F.R. § 212.111, allowed sellers to use a market price as the base price for a product in certain instances rather than the price actually charged the most similar class of purchasers on May 15, 1973. Gulf later conceded that its use of the new item-new market rule was improper. FFCL, *supra,* at 11.

price actually charged the most similar existing class on May 15, 1973.[10]

Richard W. Dyke filed a complaint on January 4, 1977 and ceased paying for gasoline received from Gulf on December 16, 1976, yet continued to receive gasoline without payment until January 28, 1977. Colvin's complaint was filed on October 11, 1977. Fletcher filed its complaint on October 20, 1977. The three cases were consolidated, with *Richard W. Dyke* proceeding to judgment first. The decision and findings in *Richard W. Dyke* were binding on Colvin and Fletcher.

The case was originally assigned to Chief Judge Skopil.[11] An interlocutory appeal was filed by the Department of Energy ("DOE") contesting their joinder in the cases. The DOE was released from further participation in the cases by this Court's decision and mandate and the district court order which followed.[12] On remand, new Chief Judge Burns granted a six-month stay in the proceedings before Judge Owen M. Panner was assigned to the cases in July, 1980.[13] Judge Panner lifted the stay on July 21, 1980.[14]

Trial before the court began on November 17, 1981. The trial was conducted in stages with succeeding orders entered as follows: In Phase 1, Gulf's use of the *Platt's Oilgram* prices as base prices for the plaintiffs was held improper. November 17, 1981; Record at Vol. 4, Tab 47. In Phase 2, the unbranded Armour class of purchasers and its corresponding base price was held proper for the plaintiffs. November 20, 1981; Record at Vol. 4, Tab 49. In Phase 3, the method of calculating the overcharges was decided, prejudgment interest was awarded to the plaintiffs, and the selection of the appropriate statute of

limitations was made. January 20, 1982; Record at Vol. 7, Tab 67. In Phase 4, plaintiff Fletcher was held to be the real party in interest. April 15, 1982; Record at Vol. 7, Tab 80. In Phase 5, attorney's fees were awarded the plaintiffs. May 27, 1982; Record at Vol. 8, Tab 93.

The calculation of prejudgment interest was referred to a magistrate on June 1, 1982.[15] The magistrate entered his Findings and Recommendations on September 9, 1982, and they were adopted by the district court on October 26, 1982.[16] The district court entered its Findings of Fact and Conclusions of Law on June 20, 1983 [17] and filed a separate opinion on the issue of attorney's fees on August 23, 1983.[18] 571 F.Supp. 780. The Amended Judgment was entered on September 12, 1983.[19] Gulf filed its Notice of Appeal in this Court on October 6, 1983. Dyke filed its Notice of Cross-Appeal in this Court on October 20, 1983.

## ISSUES

The issues on appeal, as stated by Gulf in its brief filed November 14, 1983, are as follows:

1. Whether overcharges can be refunded under the EPAA without any determination that sales exceeded the "maximum allowable prices" permitted under the governing Refiner Price Rule;

2. Whether prejudgment interest can ever be awarded on overcharge refunds under the EPAA;

3. If such prejudgment interest is ever recoverable, whether it can be awarded where the amount of overcharges to be

---

**10.** *Pacific Supply Co-Op v. Shell Oil Co.,* 697 F.2d 1084 (Em.App.1982).

**11.** FFCL, *supra,* at 12, fn. 2.

**12.** Record at Vol. 1, Tab 8, June 29, 1979; Record at Vol. 17, Tab 263, August 16, 1979. *See, Dyke v. Gulf Oil Corp.,* 601 F.2d 557 (Em. App.1979).

**13.** FFCL, *supra,* at 12, n. 2. Judge Panner began duty as U.S. District Judge on March 24, 1980.

**14.** Record at Vol. 1, Tab 14.

**15.** Record at Vol. 8, Tab 94.

**16.** Record at Vol. 9, Tab 126; Vol. 10, Tab 129.

**17.** Record at Vol. 11, Tab 147.

**18.** Record at Vol. 11, Tab 155.

**19.** Record at Vol. 11, Tab 161.

refunded was unliquidated and became certain only by trial;

4. Whether attorney's fees may be awarded under the EPAA where the overcharges were found to be unintentional;

5. Whether attorney's fees awardable under the EPAA may substantially exceed those actually charged;

6. Whether appellee Fletcher lacks standing as an indirect purchaser to sue Gulf for overcharges under the EPAA;

7. Whether application of the two-year Washington statute of limitations to Fletcher frustrates national policy under the EPAA;

8. Whether the passing-on defense is available in this EPAA case because all parties were subject to Federal Price Regulations, and the trial court specifically quantified the amount of overcharges actually passed through; and

9. Whether the trial court abused its discretion by making a class of purchaser determination contrary to the Pretrial Order without considering evidence offered in support of a motion to reopen trial of that issue.[20]

Dyke states in its brief that the issue on the cross-appeal is: Whether the Trial Court erred in its calculation of prejudgment interest.[21]

---

20. Brief of Defendant-Appellant and Cross-Appellee Gulf ("Gulf's Br.") at 3–4.

21. Brief of Plaintiffs-Appellees and Cross-Appellants Dyke, *et al.* ("Dyke's Br.") at 1.

22. Marathon Petroleum Company and Mobil Oil Corporation have filed a joint brief as *Amici Curiae* in support of Gulf's position that this case should be dismissed for lack of subject-matter jurisdiction.

23. Gulf has placed itself in the anomalous position of moving to dismiss only Dyke's cross-appeal on the basis that the statutory authority for the cross-appeal is unconstitutional. Since Gulf's appeal also depends on the validity of the EPAA and EPCA, any holding of this Court dismissing the cross-appeal because of the unconstitutionality of the EPAA or EPCA would also necessitate the dismissal of Gulf's appeal. Dyke has maintained that the constitutional is-

*Gulf's Motion to Dismiss*

▮ Gulf, without raising the question in the lower court, was given leave to file an untimely Motion to Dismiss the Cross Appeal of Dyke, which challenges the subject-matter jurisdiction of this Court following the recent Supreme Court decision in *I.N.S. v. Chadha,* — U.S. —, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Dyke has opposed the motion and contended that the *Chadha* decision did not invalidate the statutes. The United States has filed a motion to intervene on the question of the constitutionality of the statutes pursuant to 28 U.S.C. § 2403 and has also argued that the statutes remain valid.[22] Gulf contends that because the applicable statutes granting jurisdiction to this Court contain inseverable and unconstitutional legislative veto provisions, the legislation is void and this Court has no jurisdiction over the cross-appeal. It has been determined that Gulf's motion raises a jurisdictional question which we must decide.[23] After examination of the statutes, their legislative histories, prior decisions and the arguments of counsel, we conclude that the unconstitutional legislative vetoes contained in the EPAA and EPCA [Energy Policy and Conservation Act] are severable, leaving the remaining sections of the legislation intact and operable, including the sections conferring jurisdiction of this appeal upon this Court.

---

sues raised by Gulf are not in reality directed at the subject-matter jurisdiction of this Court, but rather at the decision on the merits of the District Court below. *See, Memorandum filed by Dyke, et al.,* December 28, 1983 and *Memorandum filed by Dyke, et al.,* January 10, 1984. Dyke maintains that such an argument must first be raised in the District Court below. *See, United States v. Empire Gas Corp.,* 547 F.2d 1147, 1153 (Em.App.1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 592. Gulf's motion does have such bearing on the subject-matter jurisdiction and the very viability of this Court as to mandate consideration here. We have a "duty to observe questions relating to jurisdiction whenever they may appear." *McWhirter Distributing Co. v. Texaco, Inc.,* 668 F.2d 511, 525 n. 22 (Em.App.1981), *citing Condor Operating Co. v. Sawhill,* 514 F.2d 351, 354 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). *See also, Exxon Corp. v. F.E.A.,* 516 F.2d 1397 (Em.App.1975).

■ Neither the EPAA nor the EPCA contains a severability clause.[24] The absence of such a clause, however, is in no way dispositive of the question of severability. *E.E.O.C. v. Hernando Bank, Inc.,* 724 F.2d 1188, 1190 (5th Cir.1984). Indeed, "the ultimate determination of severability will rarely turn on the presence or absence of such a clause." *United States v. Jackson,* 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968). The proper test is that "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), quoting *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932).

In order to determine whether Congress would have enacted the remainder of the EPAA and EPCA had it known that the one-house veto provisions were unconstitutional, we must examine the language and legislative history of the Acts. *E.E.O.C. v. Hernando Bank, supra,* at 1190; *Muller Optical Co. v. E.E.O.C.,* 574 F.Supp. 946 (W.D.Tenn.1983).

"Congressional intent and purpose are best determined by an analysis of the language of the statute in question." *E.E. O.C. v. Hernando Bank, supra,* at 1190.

The stated purpose of the EPAA is as follows:

Sec. 2 ...—

(b) The purpose of this Act is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this Act shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy.

The EPAA also states that it was enacted in the midst of circumstances which "constitute a national crisis which is a threat to the public health, safety, and welfare," EPAA § 2(a)(3), and that its purpose is to provide for "equitable distribution of crude oil, residual fuel oil, and refined petroleum products *at equitable prices* among all ... sectors of the petroleum industry." EPAA, as amended, 15 U.S.C. § 753(b)(1)(F) *quoted in United States v. Heller,* 726 F.2d 756 (Em.App.1983). (Emphasis added.)

The purpose of the EPCA is stated, in part, in the Act as follows:

Sec. 2. The purposes of this Act are—

(1) to grant specific standby authority to the President, subject to congressional review, to impose rationing, to reduce demand for energy through the implementation of energy conservation plans, and to fulfill obligations of the United States under the international energy program. . . .

While the stated purposes of the EPCA include a reference to the congressional veto, it does not follow that the veto provisions are inseverable. The intention of Congress to review the President's actions through the veto is obvious from the face of the legislation. Our task is to determine "whether Congress would have enacted the remainder of the statute[s] without the unconstitutional [veto] provisions." *Consumer Energy Council of America v. F.E. R.C.,* 673 F.2d 425, 442 (D.C.Cir.1982), *aff'd*

---

**24.** However, the ESA, which was the precursor of the EPAA and EPCA, does contain a severability clause at Section 220. We are also most persuaded by the language of Section 211(g) of the ESA that Congress intended this Court to sever unconstitutional portions of the statutes and leave the remainder intact: "[T]he Temporary Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Temporary Emergency Court of Appeals, shall have exclusive jurisdiction to determine the *constitutional validity of any provision of this title or of any regulation issued under this title.*" (Emphasis Added). This Court was given full authority to determine the unconstitutionality of one provision of a statute without the requirement of invalidating the whole statute as a result.

*sub nom.,* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983).

Gulf cites numerous portions of the legislative history in an attempt to prove that the compromise between the flexibility desired by the Executive and the oversight demanded by Congress was an extremely fragile one which could not have been enacted absent the legislative veto provisions. In none of these references, however, do we find a clear indication that the EPAA or EPCA would not have been passed without such vetoes. *E.E.O.C. v. Hernando Bank, supra,* at 1191. The mere presence of continued and heated debates prior to the passage of the Acts cannot provide the evidence necessary for us to conclude that the legislative vetoes are inseverable and that the sections in which they appear, as well as the sections conferring jurisdiction on this Court, must be invalidated. *See Allen v. Carmen,* 578 F.Supp. 951 (D.D.C., 1983), and *United States v. Sutton,* 585 F.Supp. 1478 (N.D.Okl. 1984).

We also are not persuaded by the reference to the veto provisions in the legislative history which describe their operation. Such descriptions are not helpful in determining what Congress would have intended had it known the legislative vetoes were invalid. *Consumer Energy Council of America v. F.E.R.C., supra,* 673 F.2d at 442. We therefore conclude that it is not evident that Congress would have declined to enact the EPAA and EPCA without the legislative veto provisions.

We reach this conclusion because, contrary to Gulf's contention, the question is not whether Congress would have enacted these *exact* statutes had it known at the time of enactment that the legislative veto provisions were invalid, but rather, whether Congress would have preferred these statutes, after severance of the legislative veto provisions, to no statutes at all.

We must next determine if what remains in the Acts is "fully operative as a law." *Buckley v. Valeo, supra,* 424 U.S. at 109, 96 S.Ct. at 677. The legislative veto provision of the EPAA appears in Section 4(g)(2).[25] Once the veto is severed, the remainder of Section 4(g)(2) gives the President limited decontrol authority over crude oil, residual fuel oil, or any refined petroleum product after making specific findings that regulation of such oil or product is no longer necessary under the Act, that no shortage exists and that exempting such oil or product will not have an adverse impact on the supply of other oil or products. Without the veto, Section 4(g)(2) is "fully operative as a law." *Id.*

Similarly, the legislative veto provisions contained in the EPCA, once removed, leave the remainder of the Act "fully operative as a law." *Id.* In fact, the hard-fought compromise between the Executive and Congress over pricing and decontrol, which Gulf contends demonstrates the inseverability of the vetoes, is maintained after severance. Without the vetoes, Sections 401 and 455 of the EPCA resemble "report and wait" procedures specifically approved in *Chadha.*[26] *I.N.S. v. Chadha,*

---

**25.** The veto provision of Section 4(g)(2) of the EPAA is as follows:

Such an amendment shall take effect on a date specified in the amendment, but in no case sooner than the close of the earliest period which begins after the submission of such amendment to the Congress and which includes at least five days during which the House was in session and at least five days during which the Senate was in session; *except that such amendment shall not take effect if before the expiration of such period either House of Congress approves a resolution of that House stating in substance that such House disapproves such amendment.* (Emphasis Added)

**26.** Either House of Congress could unilaterally veto an amendment proposed by the President by following the procedures for congressional review contained in § 551 of the EPCA. When the legislative veto in § 551(c)(1) is excised from the section a fully workable "report and wait" procedure is preserved. The President could still propose an amendment to the Congress, but Congress would be able to prevent its effectiveness by passing legislation contrary to the amendment within specified time periods. Thus, Congress would still retain the opportunity to review Presidential proposals, but would only be able to disapprove of such actions through use of the constitutional legislative process. Such a procedure is not only workable, but preserves to the greatest extent possible the

*supra,* 103 S.Ct. at 2776 n. 9, and *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941).

From the beginning of price controls under federal statutes and regulations, courts have resolved challenges to their constitutionality. *See, Amalgamated Meat Cutters and Butcher Workers of North America v. Connally,* 337 F.Supp. 737 (D.D.C. 1971); *Consumers Union of U.S., Inc. v. Sawhill,* 525 F.2d 1068 (Em.App.1975). These challenges have escalated enormously since the enactment of the EPAA and EPCA. *See, Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *Cities Service Co. v. F.E.A.,* 529 F.2d 1016 (Em.App.1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976), the authorities therein, and their progeny. The scope of these attacks has been unreasonably broad. The statutes have been upheld because "[a] limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921). As the program under the law winds down in the wake of decontrol, this latest and broadest attack also is without merit.

Therefore, we conclude that the unconstitutional legislative veto provisions of the EPAA and EPCA are severable, leaving the remainder of the Acts intact and with no effect on this Court's jurisdiction. Gulf's Motion to Dismiss the Cross-Appeal is DENIED.

*Computation of Maximum Allowable Price in Determining Overcharges*

Gulf contends that the District Court did not determine that its prices charged to Dyke exceeded the "maximum allowable price." Such a finding, Gulf states, is necessary before concluding that overcharges have occurred. "Maximum allowable price" is defined in the regulations as: "... the weighted average price at which the covered product was lawfully priced on May 15, 1973, computed in accordance with the provision of [10 C.F.R.] § 212.83(a), plus increased product costs and increased non-product costs incurred between the month of measurement and the month of May 1973." 10 C.F.R. § 212.82.

*See also, Wellven, Inc. v. Gulf Oil Corp.,* 731 F.2d 892 (Em.App.1984).

▄▄ Gulf cites our decision in *Longview Refining Co. v. Shore,* 554 F.2d 1006 (Em. App.1977), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), as requiring specific findings by the district court establishing the existence of overcharges in a sum certain before a plaintiff may recover. 554 F.2d at 1012. While such specific findings are indeed required by *Longview,* the findings which supposedly established the maximum allowable price in *Longview* were "defectively general and all-inclusive." *Id.* at 1018. We hold that the District Court's findings and method of computing overcharges in this case, although erroneous as to class of purchaser base price for reasons hereafter to be discussed, were otherwise sufficient under the regulations.

The District Judge used the following formula to compute overcharges:

"The proper method in this case for calculating the overcharges is to subtract the court-ordered May 15, 1973 prices to Dyke from the May 15, 1973 prices imputed to Dyke based on *Platt's Oilgram.* If Gulf did not actually pass through its full cost increment to Dyke in a month, the cost increment difference is to be subtracted from the overcharge calculated on May 15 prices. The difference shall be multiplied by the volume of each grade of gasoline sold to Dyke in each month ...." FFCL, Record at Vol. 11, Tab 147, p. 19.

Using this formula, the parties then stipulated the amount of the overcharges. *Id.* at p. 20.

This method employs both May 15, 1973 base prices and Gulf's stated increased

compromise between Congress and the Executive intended in the legislation.

costs to arrive at the maximum allowable price. Using the figures provided by Gulf, the district court was able to determine the costs Gulf elected to pass through each month [27] as well as the dates on which Gulf did not charge Dyke the full amount of increased costs available.[28] Gulf was given credit for these undercharges to Dyke in computing total overcharges. Thus the findings sufficiently found all of the elements of the maximum allowable price calculations as a basis for determining that sales exceeded the "maximum allowable prices" permitted under the governing Refiner Price Rule.

*Prejudgment Interest*

■ We hold that this case is not an appropriate one in which to award prejudgment interest. Accordingly, we need not reach the question of whether prejudgment interest may ever be awarded in an overcharge case under the EPAA. Recently, we declined to award prejudgment interest in two cases because the amount claimed was not for a "liquidated or readily liquidatable sum." *Eastern Air Lines, Inc. v. Atlantic Richfield Co.,* 712 F.2d 1402, 1410 (Em.App.), *cert. denied,* — U.S. —, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983); *Zahir v. Shell Oil Co.,* 718 F.2d 1567, 1573 (Em. App.1983). In addition, prejudgment interest is not appropriate in this case because the ultimate amount of the overcharge was the "subject of great uncertainty," [29] requiring extensive testimony and arguments from counsel before the court could select even a method for calculating the alleged overcharges. Following our decision in *Eastern Air Lines, supra,* Gulf filed a motion to amend the Findings of Fact and Conclusions of Law to delete the award of prejudgment interest.[30] In an Order dated August 24, 1983, Judge Panner denied the

motion, stating only, "The motion to deny an award of prejudgment interest is DENIED because Magistrate Juba was able to determine appropriate amounts with certainty. Therefore, *Eastern Air Lines* does not control." [31] While it is true that the magistrate was able to ultimately determine an amount certain to be applied as prejudgment interest following the judge's ruling, certainty in calculating interest on a definite sum is not what *Zahir* and *Eastern* require. Rather, we again hold that in this case, where the amount claimed to be due varied and was uncertain, it is "inequitable and unjust" to award prejudgment interest.[32]

*Attorney's Fees*

The district judge awarded Dyke $750,000 in attorney's fees,[33] finding that our recent decision of *Eastern Air Lines, supra,* was not controlling. In *Eastern Air Lines,* we conducted an extensive study of § 210(b) of the ESA [34] and the limitations on a judge's discretion in awarding attorney's fees imposed by that section:

"... [T]o deprive the court of its discretionary power to award treble damages and attorney's fees, the defendant making the overcharge must prove that (1) the overcharge was not intentional, and (2) the overcharge resulted from a *bona fide* error notwithstanding (3) the maintenance by the defendant of procedures reasonably adapted to the avoidance of such error.

"In the absence of such proof by the defendant the court in its discretion may award treble damages and attorney's fees if it finds the overcharge was intentional or resulted from reprehensible or criminal conduct, or lack of procedures

---

27. Record at Vol. 17, Tab 292.

28. *Id.*

29. *Eastern Air Lines, supra,* at 1410.

30. Record at Vol. 16, Tab 254.

31. Record at Vol. 16, Tab 256, p. 2.

32. *Eastern Air Lines, supra,* at 1410.

33. Record at Vol. 11, Tab 161.

34. Although the district judge stated that "TECA was not required in [*Eastern Air Lines*] to carefully analyze the language of the statute authorizing attorneys' fees" (Record at Vol. 11, Tab 155, p. 3), we believe our analysis in *Eastern* was thorough and is controlling.

reasonably adapted to the avoidance of erroneous overcharges, or bad faith, or where required by equity and the ends of justice." *Eastern Air Lines, supra,* at 1412; second paragraph *quoted in, Wellven, Inc. v. Gulf Oil Corp., supra.*

The Findings of Fact and Conclusions of Law contain the express finding that any overcharges by Gulf were not intentional. "... In light of the circumstances and lack of guidelines at the time Gulf's decision was made, I find that the overcharges were not intentional." FFCL, Record at Vol. 11, Tab 147, pp. 21–22.[35]

■ In view of the findings made by the district judge that the overcharge was not intentional and, although not in the "precise language"[36] of § 210(b), the finding that Gulf maintained "procedures reasonably adapted to the avoidance" of an overcharge,[37] as well as our conclusion upon examination of the record that any overcharges were the result of a *bona fide* error, we hold that it was plain error to award any attorney's fees in this case. In any event, the amount of attorney's fees awarded here was so excessive as to constitute a clear abuse of discretion.[38]

*Plaintiff Fletcher's Standing to Sue*

Gulf claims that Plaintiff Fletcher has no standing to sue under ESA § 210 for overcharges because Fletcher was an indirect purchaser from Gulf. The contract for sale of gasoline was between Gulf and Tesoro Petroleum Corporation. Tesoro then resold the gasoline to Fletcher.[39] Section 210(b) of the ESA authorizes suits for overcharges "... against any person renting or selling goods or services *who is found to have overcharged the plaintiff.*" (Emphasis added) We hold that, on the basis of our examination of the record and as a matter of law, Fletcher was an indirect purchaser from Gulf. Indeed, Plaintiffs' counsel classified Fletcher in this statement to Judge Panner: "That's a question of whether Fletcher is entitled as a subjobber and has standing to bring this matter in the first place." Record at Vol. 21, Tab 325, p. 233, l. 21.

■ Fletcher was an indirect purchaser with no standing to sue for overcharges, and we so hold. *See, Palazzo v. Gulf Oil Corp.,* 4 Energy Mgt. ¶ 26,448 (Em.App. 1983), *cert. denied,* — U.S. —, 104 S.Ct. 1424, 79 L.Ed.2d 749 (1984); *Arnson v. General Motors Corp.,* 377 F.Supp. 209 (N.D.Ohio 1974). When Congress created

**35.** *See also,* Record at Vol. 25, Tab 329, p. 1158, l. 17. In *Longview Refining Co. v. Shore, supra,* at 1014, n. 20 (Em.App.1977), this Court warned, "Fundamental fairness requires that the regulations be clear so that men of common intelligence need not guess at the meaning and differ as to the application. *Boyce Motor Lines v. United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952);" also *Standard Oil Co. v. D.O.E.,* 596 F.2d 1029, 1065, n. 87 (Em.App. 1978).

**36.** *Eastern Air Lines, supra,* at 1412.

**37.** *Id.*

**38.** *Id.* The attorney's fees awarded in this case were grossly excessive and a clear abuse of the judge's discretion. The last-submitted affidavit of plaintiff's counsel in support of the motion for attorney's fees included in the record reflects a requested *bonus* payment of $84,600.00. The requested fees were $397,641.60 and stated expenses were $17,289.76. The total of submitted fees, expenses and bonus through March 10, 1983 was $499,531.36. Record at Vol. 11,

Tab 144. Judge Panner made an award of attorney's fees in the amount of $750,000.00, *supra,* and Record at Vol. 11, Tab 161, representing a bonus payment of $250,468.84 more than the total of fees, expenses and bonus in the affidavit. Including the bonus of $84,600.00 which was requested in the affidavit, the total bonus to plaintiffs' attorneys was $335,068.64. Additionally, the itemized billing statements submitted by plaintiffs' counsel include substantial charges made for the *Amici Curiae* brief filed on behalf of these plaintiffs on January 12, 1983 in *Eastern Air Lines v. Atlantic Richfield Co., supra,* before this Court. The *Amici* brief urged the same positions on the prejudgment interest and attorney's fees issues as plaintiffs have argued in the present case. In *Eastern Air Lines,* these positions were rejected by this Court.

**39.** Fletcher paid Tesoro Gulf's sales price plus a fixed markup of $.00375 per gallon. FFCL, *supra,* at 14. We are not convinced that the "unique relationship" the district court found between Gulf, Tesoro and Fletcher (*Id.* at 12–15) requires a determination that Fletcher was anything other than an indirect purchaser from Gulf.

the Temporary Emergency Court of Appeals as "a court of special and limited jurisdiction" [40] which should "strictly construe [its] statutory grants of jurisdiction," [41] it did not authorize recovery of overcharges by indirect purchasers. The EPAA expired by its own terms in September, 1981. We will not expand the statutes while exercising our jurisdiction under the savings clause. 15 U.S.C. § 760g.

*Statute of Limitations*

■ In addition to our foregoing holding that Plaintiff Fletcher does not have standing to sue Gulf, we hold that any claim by Fletcher would also be barred by the applicable statute of limitations. Because the ESA, EPAA and EPCA do not contain specific statutes of limitation, we must apply the most closely analogous state statute of limitation to causes of action arising under the Acts. *Ashland Oil Co. of California v. Union Oil Co. of California*, 567 F.2d 984 (Em.App.1977), *cert. denied*, 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978); *Colorado Petroleum Products Co. v. Husky Oil Co.*, 646 F.2d 555 (Em.App. 1981).

■ The district judge applied the Oregon six-year statute of limitations to Plaintiff Fletcher.[42] We hold that this was plain error and that the Washington two-year statute of limitations [43] should be applied to Fletcher.

Plaintiff Fletcher is a Washington resident.[44] Fletcher purchased 60 percent of its gasoline in Washington and 40 percent in Oregon.[45] All of Fletcher's gasoline was sold in Washington.[46] Gulf is a Pennsylvania corporation.[47] Under Oregon's "borrowing statute," Or.Rev.Stat. § 12.260, when two nonresidents bring a cause of action in an Oregon court which arose in another state, the Oregon court will apply the foreign state's statute of limitations if it is shorter than Oregon's.

The district judge held that although the "borrowing statute" might be applicable, his decision should also be governed by general Oregon choice of law standards.[48] Under Oregon law, when more than one state has an interest in a controversy, the law of the state which has the "most significant relationship" to the controversy will be applied.[49] The district judge found that Washington had no true interest in the controversy.[50] We disagree. Plaintiff Fletcher is a Washington resident. Most of the gasoline was purchased in Washington, and all of it was sold there. We hold that, as between Washington and Oregon, Washington had the more significant relationship to the controversy. Oregon's "borrowing statute" is applicable, and the shorter Washington two-year statute of limitations should apply to Fletcher.

The district judge also declined to apply Washington's two-year statute of limitations because he found that "a two-year limitation places a bar on recovery inconsistent with federal policy." [51] We have already held that "[a] two-year statute is certainly not inconsistent with national energy policy seeking to wind up regulation of the oil industry—'temporary' *ab initio*." *Johnson Oil Co. v. DOE*, 690 F.2d 191, 196 (Em.App.1982). *See also, Ashland Oil Co. v. Union Oil Co. of California, supra;*

**40.** *Texaco, Inc. v. D.O.E.*, 616 F.2d 1193, 1196 (Em.App.1979), and authorities cited therein.

**41.** *United States v. Cooper*, 482 F.2d 1393, 1398 (Em.App.1973), approved by the Supreme Court in *Bray v. United States*, 423 U.S. 73, 96 S.Ct. 307, 309, 46 L.Ed.2d 215 (1975).

**42.** Or.Rev.Stat. § 12.080 (1983).

**43.** Wash.Rev.Code § 4.16.130 (1962).

**44.** FFCL, Record at Volume 11, Tab 147, App. A, p. 2.

**45.** *Id.*

**46.** *Id.*

**47.** *Id.*

**48.** *Id.* at 4.

**49.** *Id., citing Fisher v. Huck,* 50 Or.App. 635, 624 P.2d 177 (1981).

**50.** *Id.* at 6.

**51.** *Id.*

*Siegel Oil Co. v. Gulf Oil Corp.*, 701 F.2d 149, 152 (Em.App.1983).

Therefore, Washington's two-year statute of limitations should be applied to Plaintiff Fletcher. Fletcher's claim was brought in 1977 for overcharges beginning in 1974. In a case such as this, where any overcharges incurred resulted from an initial improper base price, the statute of limitations begins to run from the date of the first overcharge. *Western Mountain Oil, Inc. v. Gulf Oil Corp.*, 726 F.2d 765 (Em. App.1983); *Fleetwing Corp. v. Mobil Oil Corp.*, 726 F.2d 768 (Em.App.1983); *Lerner v. Atlantic Richfield Co.*, 731 F.2d 898 (Em.App.1984), *rehearing en banc denied*, April 10, 1984. Fletcher's claim for overcharges is barred by Wash.Rev.Code § 4.16.130.

### Passing On Defense

Gulf claims that those overcharges which were passed through to the Plaintiffs' service station customers should not be refunded because the Plaintiffs' suffered no economic injury from overcharges which were passed down the stream of commerce.[52] Although such use of a passing on defense has been denied because of difficulty of proof in the past,[53] Gulf argues that in determining the sum on which to award prejudgment interest, the trial court sufficiently found the amounts which the Plaintiffs had passed through to their customers, and therefore, no difficulty of proof problem exists which would prevent the use of passing on as an affirmative defense.[54]

In *Eastern Air Lines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497 (Em.App.1979) ("ARCO I"), this Court refused to allow a passing on defense in an overcharge action. In ARCO I, we held that, in order to be excepted from the general rule disallowing

the affirmative pass on defense,[55] the defendant must establish that a preexisting functional equivalent of a cost-plus contract[56] existed in which Plaintiffs would necessarily pass through any overcharge received, and that the effect of the overcharge to Plaintiffs must be capable of determination in advance. *Id.* at 498.

■ Therefore, Gulf's assertion that the overcharges passed on by Plaintiffs were determined by the magistrate at trial, thus obviating any difficulty of proof problem, misses the point. In order for Gulf to successfully assert the passing on defense, the impact of any overcharges made by it to plaintiffs must be determinable *before* the overcharges occurred. Such was not the case here. There was no certainty about how plaintiffs would price their gasoline at the service station in response to the amount charged by Gulf. Because the exception to the general rule disallowing passing on as a defense is narrow, we hold that Gulf may not use the passing on defense in this case where no preexisting functional equivalent of a cost-plus contract existed.

### Class of Purchaser Determination

Gulf asks us to overturn the district judge's order denying Gulf's motion to reopen the trial on the class of purchaser issue.[57] Gulf sought to introduce additional evidence to show that the San Francisco Bay area, where Armour is located, is a distinct market from the Seattle-Tacoma-Portland area, where Plaintiffs are located, and thus it would be inappropriate to use the same classification and base price for Armour and the Plaintiffs.

■ Judge Panner denied the motion to reopen the trial during a telephone

---

52. Gulf's Brief at 21.

53. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Eastern Air Lines v. Atlantic Richfield Co.*, 609 F.2d 497 (Em.App.1979) ("ARCO I").

54. Gulf's Brief at 21–23.

55. *See, Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

56. *Id.; In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir.1979).

57. Gulf's Brief at 24.

conference on May 12, 1982,[58] sixteen months before a final judgment was entered on September 12, 1983. It is apparent from the transcript of that conference that the judge had not fully considered the memorandum and affidavit accompanying Gulf's motion.[59] Although the grant or denial of a motion to reopen the trial is within the district judge's discretion,[60] we hold that the refusal to reopen the trial in this case was an abuse of discretion and clear error.

The district judge's ruling on the motion to reopen the trial without considering the supporting documents filed by Gulf was an abuse of discretion. *See, Sertic v. Cuyahoga Counties Carpenters Dist. Council,* 459 F.2d 579 (6th Cir.1972). The Pretrial Order in this case was extremely vague as to the issues framed for trial,[61] and we hold that Gulf did not have a full and fair opportunity to present evidence on its most similar existing class of purchaser after the ruling denying the use of *Platt's Oilgram* as a base price determinant. Therefore, we reverse and remand the district judge's ruling on the motion to reopen trial and direct him to consider Gulf's evidence and make a new determination of the proper class of purchaser and base price for the plaintiffs.

## CONCLUSION

1. Gulf's Motion to Dismiss is DENIED.

2. The district court's Order determining the proper class of purchaser for Plaintiffs is REVERSED and REMANDED with directions to reopen the trial to consider Gulf's evidence on the class of purchaser issue. Any award of overcharges must be recalculated to reflect any change in base price.

3. The Orders of the district court granting attorney's fees and prejudgment interest are REVERSED.

4. That portion of the judgment of the district court awarding overcharges to Plaintiff Fletcher is REVERSED.

The judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this opinion.

CHRISTENSEN, Judge, concurring:

The prevailing opinion has my full concurrence but I wish to add a few words to clarify an unaddressed misconception relating to the wording of the controlling statute which might otherwise appear on its face to carry weight.

The contention has been made that if, as held in *Eastern Airlines,* a court's discretion to award attorney's fees under section 210(b) of the ESA is limited to cases of willful overcharges, mention of "costs" would not have been included in the phrase "reasonable attorney's fees and costs," since under the general rule taxable costs are recoverable by prevailing parties in any event. The contention fails to recognize the distinction between taxable costs awardable as of course to a prevailing party apart from adjudged liability and "reasonable attorney's fees and costs" as a liability authorized in departure from the American Rule as to attorney's fees because of certain recognized equitable considerations or, as here, by express statutory provision under specified conditions. If the term "costs" in line with the argument had been eliminated from the phrase, a more plausible contention could have been made that even taxable costs could not be recovered at all in case of willful overcharges whereas they would have been if the overcharges were not willful. Congress did not need to invite the latter unreasonable construction by omitting the

**58.** Record at Vol. 19, Tab 323.

**59.** *Id.* at 3.

**60.** *Sanders v. Int'l. Ass'n. of Bridge Workers,* 546 F.2d 879 (10th Cir.1976).

**61.** Although the Pretrial Order contained references to the Armour class of purchaser, the record reflects that the idea of using the Armour base price for Plaintiffs was first seriously considered at trial.

mention of costs in connection with its reference to attorney's fees. It plainly indicated its intention to the contrary and it would be quite unreasonable to hold that in so doing it granted carte blanche discretion to award "attorney's fees and costs" in disregard of the limitations it specified merely because taxable costs otherwise may have been awardable to a prevailing party without reference to those limitations.

ZIRPOLI, Judge, concurring in part and dissenting in part:

While I am in accord with the opinion of the majority on the issues of jurisdiction, remand for further trial on the class of purchasers determination, and the statute of limitations applicable to Fletcher, I cannot agree with the majority's conclusions on the issues of prejudgment interest, attorney's fees, and Fletcher's standing. Accordingly, I must respectfully dissent.

A. *Prejudgment Interest*

The majority concludes that it was improper for the district court to award prejudgment interest in this case because the amount of overcharges by Gulf were not certain until after trial. The majority relies on *Zahir v. Shell Oil Co.*, 718 F.2d 1567, 1573 (Em.App.1983), and *Eastern Air Lines, Inc. v. Atlantic Richfield Co.*, 712 F.2d 1402, 1410 (Em.App.), *cert. denied,* —— U.S. ——, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983). Neither of these cases bars an award of prejudgment interest in the present case. Because I find no abuse of discretion in the trial court's award of prejudgment interest in this case, I would affirm that portion of the decision.

"In the absence of an unequivocal prohibition of interest, and where the statute imposes a money obligation, the power of the court to award interest is dependent on an appraisal of the congressional purpose of imposing the obligation and on the relative equities of the parties." *Hodgson v. American Can Co.*, 440 F.2d 916, 922 (8th Cir.1971). The statute authorizing suits to collect overcharges is remedial in nature and designed to compensate those who have been overcharged for the losses that they sustained as a result of the overcharges. *See Minnesota v. Standard Oil Co.*, 516 F.Supp. 682, 687 (D.Minn.1981); *Ashland Oil Co. of California v. Union Oil Co.*, 567 F.2d 984, 990 n. 12 (Em.App.1977). An award of prejudgment interest to compensate plaintiffs for the loss of the use of money is consistent with the congressional purpose of this statute.

The relative equities of the parties in this case do not tip so strongly towards Gulf as to render the award of prejudgment interest to plaintiffs an *abuse of discretion.* While it may be true that Gulf had financial difficulties in the Pacific Northwest where plaintiffs operate, this is not a proper factor to consider in deciding whether or not to award prejudgment interest, nor does it appear that the majority considers this to be a relevant consideration, since it is not mentioned in the opinion. What is a relevant factor, is that Gulf conceded its use of spot purchase prices reported in *Platt's Oilgram* for establishing plaintiffs' base price was unjustified. In deciding to award prejudgment interest, the trial court expressed its "concern that there wasn't a more serious effort [by Gulf] ... to correct the overcharge." (Tr. 1159). Although the trial court did find that Gulf's overcharges were not intentional, and so did not award treble damages, I think that it was well within its discretion to award prejudgment interest to plaintiffs on overcharges which they did not pass through to their customers.

The majority bases its reversal of the award of prejudgment interest on the fact that the principal amount of the overcharge was the "subject of a great amount of uncertainty" because the parties were in disagreement as to what was the most appropriate class of purchasers for plaintiffs. Until the trial court had ruled on the appropriate class of purchasers question, the principal amount of overcharges could not be computed. Because this uncertainty as to a legal issue is not the type which is traditionally held to preclude an award of prejudgment interest, I would defer to the trial court's determination that the relative

equities of the parties, as well as the remedial purpose of the statute, warranted the award. Neither *Zahir* or *Eastern Airlines* dictates otherwise.

In both *Zahir* and *Eastern,* this court affirmed the trial court's *denial* of prejudgment interest. In *Zahir* it was held that "the trial court did not abuse its discretion" in declining to award prejudgment interest where the plaintiff's claim was "not for a liquidated or readily liquidatable sum." 718 F.2d at 1573. In that case, the plaintiff's claim upon which he sought prejudgment interest was for *lost profits* due to the defendant's failure to supply him with gasoline. A claim for lost profits is a highly speculative type of injury which must be estimated, rather than one which is capable of determination with mathematical precision. It has long been the rule that awards of prejudgment interest are not given on claims of injury which are not of the type capable of reasonably precise determination. Thus, the refusal of the trial court to award prejudgment interest in *Zahir* was clearly correct.

In the present case, on the other hand, the injury suffered by plaintiffs was one capable of mathematical computation. The "uncertainty" involved was due to the parties' dispute as to which was the proper class of purchasers for determining plaintiffs' base price. Once the trial court had made its ruling on the class of purchasers question, the principal amount of the overcharge was one capable of mathematical computation.[1]

Courts have traditionally had discretion to award prejudgment interest in cases where the damages are liquidated or capable of mathematical computation. Thus, it has been said that "interest is allowed on all claims that are liquidated or readily ascertainable by mathematical computations ... in other words where it is not

necessary to rely upon opinion or discretion." *Nelse Mortensen & Co. v. United States,* 305 F.Supp. 470, 471 (E.D.Wash. 1969) (quoting from *Caterpillar Tractor v. Collins Machinery Co.,* 286 F.2d 446 (9th Cir.1960)). A disputed claim is not rendered unliquidated or incapable of precise valuation merely because the parties disagree as to the proper method for calculating the principal amount due. Thus, in *American Enka Co. v. Wicaco Mach. Corp.,* 686 F.2d 1050, 1057 (3rd Cir.1982), where the parties were in disagreement over the correct date to be used for an award of the market value of goods lost by a bailee, the court held that the dispute concerned a liquidated amount "capable of ascertainment with mathematical precision" (once it was determined which was the proper date for purposes of valuing the property) and the trial court had discretion to award prejudgment interest. *See also, Mortensen,* 305 F.Supp. at 471 ("Mere difference of opinion as to amount is, however, no more a reason to excuse him from interest than difference of opinion whether he legally ought to pay at all, which has never been held an excuse." (emphasis deleted; quoting from *Prier v. Refrigeration Engineering Co.,* 74 Wash.2d 25, 442 P.2d 621, 627 (1968).)

Nor does *Eastern Airlines* dictate any deviation from the traditional principle that the trial court has *discretion* to award prejudgment interest on sums which are liquidated or "capable of ascertainment with mathematical precision." *American Enka,* 686 F.2d at 1057. In *Eastern,* as noted above, the trial court did *not* award prejudgment interest, and this decision was affirmed. In the present case, on the other hand, the trial court, in its discretion, did award prejudgment interest. The majority, with no discussion of the relative equities of the parties or the remedial purpose of

---

1. A great deal of time was spent in determining what portion of the overcharges plaintiffs had passed through to their customers. The trial court had ruled that it would be inequitable to award plaintiffs prejudgment interest on overcharges that they had passed through, since to the extent of such pass-throughs, plaintiffs had not been deprived of the use of the money. Gulf should not be heard to complain about any "uncertainty" involved in determining the amount passed through, since this equitable determination to limit the award of prejudgment interest on overcharges was to *Gulf's* benefit.

the statute, holds that the trial court abused its discretion in awarding prejudgment interest in this case.

The majority apparently relies on the broad language in *Eastern* that "prejudgment interest is not available where the amount of damages claimed to be due is uncertain." 712 F.2d at 1410. However, as noted above, it is not every type of "uncertainty" which will preclude an award of prejudgment interest. An examination of the case cited in *Eastern* in support of the quoted language shows the relevant type of uncertainty to be that due to inherent difficulty in measuring the extent of injury, such as that involved in *Zahir*. The case cited in *Eastern*, *Belcher v. Birmingham National Bank*, 488 F.2d 474, 478 (5th Cir.1973), was an action to recover the value of services rendered. In determining the reasonable value of services rendered, the court must rely upon "opinion or discretion" to *estimate* the principal amount to be awarded. *Mortensen*, 305 F.Supp. at 471. Such an estimate necessarily means that the amount is not "readily ascertainable by mathematical computations." *Id.* Thus, the authority cited in *Eastern* does not support any broad rule that a dispute as to the legal issue of the most appropriate class of purchasers for plaintiffs will preclude an award of prejudgment interest. Furthermore, any such broad rule would be contrary to the remedial purposes of the statute. Thus, I do not read *Eastern* as holding that the trial court would have abused its discretion *if it had* awarded prejudgment interest in that case. Rather, as was made clear in *Zahir*, the trial court had discretion to deny prejudgment interest in *Eastern*, depending upon the equities, and there was no indication that it had abused its discretion in that case.

In the present case, the trial court considered the equities and the remedial purposes of the statute and concluded that an award of prejudgment interest was appropriate. I find no reason to overturn this decision.

## B. *Attorney's Fees*

I must dissent from the majority's determination that it was "plain error" to award attorney's fees in this case. While I find the majority opinion somewhat ambiguous as to the basis for its holding on this question, I assume that the opinion is intended to hold that an award of attorney's fees is *never* authorized under section 210(b) of the Economic Stabilization Act if the defendant proves that the overcharge was "not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error." 12 U.S.C. § 1904 note. I do not think that a close examination of the statute supports this interpretation.

As a preliminary matter, it should be noted that although the trial court did expressly find that the overcharges in this case were not intentional, there was no express finding that they were the result of a "bona fide error notwithstanding the maintenance of [adequate procedures designed to prevent such errors]." The majority's statement that the "finding that Gulf maintained 'procedures reasonably adapted to the avoidance' of an overcharge" was not in the "precise language" of the statute (*see* opinion at 807) is somewhat misleading, since not only was such a finding not in the "precise language" of the statute, it was not made *at all*. Nevertheless, since I think it is clear that such a finding was impliedly made, I do not take issue with the majority's conclusion that Gulf had proven that the overcharges were the result of a bona fide error. I make this observation only to make absolutely clear that this court was not under the erroneous impression that the trial court had made *some* express finding, even though not in the "precise language" of the statute. The basis for my conclusion that the trial court had made an implied finding that Gulf had made the overcharges in good faith notwithstanding the maintenance of adequate procedures is that the trial court went to the trouble of deciding a difficult statutory interpretation question as to whether attorney's fees were awardable even in cases where treble damages are not. Treble damages are clearly not awardable under

section 210(b) where the defendant proves that the overcharge was unintentional and the result of a bona fide error notwithstanding the maintenance of adequate procedures. If the trial court had not made an implied finding that Gulf's overcharges were the result of a good faith error, it would not have been necessary for it to decide the statutory interpretation question.

Unlike the majority, I agree with the district court's conclusion that section 210(b) authorizes an award of attorney's fees in this case even though Gulf had satisfied the court that its error was unintentional and the result of a good faith error. Section 210(b) provides, in pertinent part, as follows:

> [T]he court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:
>
> (1) an amount not more than three times the amount of the overcharge upon which the action is based, or
>
> (2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge ....

12 U.S.C. § 1904 note.

Upon close examination of the statute, the district court concluded that "the language of exception beginning with the word 'except' modifies only the language that follows the word 'plus.'" Thus, the court concluded that it had discretion to award attorney's fees in this case. I agree. Under the interpretation of this statute

adopted by the majority, the award of costs, as well as attorney's fees, would not be authorized in cases where the defendant proves that the overcharge was unintentional. Such an interpretation clearly would run counter to the remedial purpose of the statute and to Congress' intent that private actions should play a "critical" role in the enforcement of the price regulations. *See Ashland Oil,* 567 F.2d at 990 n. 11. While the opinion in *Eastern* does include dicta which supports the majority's interpretation, the holding in that case was merely that the trial court had not erred in *denying* an award of attorney's fees and treble damages, and there is no indication that the court in that case was called upon to closely examine the statute.

Thus, I conclude that section 210(b) authorizes the court, in its discretion, to award "attorney's fees and costs" to a successful plaintiff in an action to recover overcharges even in cases where the defendant makes a showing that would preclude an award of treble damages. Since there is no indication that it would be an abuse of discretion to award any amount of attorney's fees, I respectfully dissent.[2]

## C. *Fletcher's Standing*

Although I concur in the majority's holding that the two-year Washington statute of limitations bars Fletcher's claims, and so do not believe it is necessary for the court to rule on the issue of Fletcher's standing, because the majority has expressed its views on this issue, I feel constrained to state my views.

Fletcher was a retail seller of gasoline under the Gulf brand in Washington and Oregon until Gulf withdrew its brand from the region in 1974. Gulf continued to supply gasoline to Fletcher and the other plaintiffs after 1974, on an unbranded basis, as

---

**2.** Since I concur in the holding that this case should be remanded to permit Gulf to introduce new evidence on the class of purchasers issue, I express no opinion as to whether the amount of attorney's fees awarded in this case was reasonable. I would note, however, that plaintiffs are entitled to recover a "reasonable fee" based upon the "prevailing market rates" in the com-

munity, and are not restricted to recovery of the fees *actually billed. Blum v. Stenson,* — U.S. —, —, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). It appears that a substantial portion of the "bonus" referred to by the majority (*see* opinion note 38) may be attributable to the fact that the fees actually billed plaintiffs were lower than the market rate.

required by the mandatory allocation regulations. The gasoline sold by Fletcher under the Gulf brand was purchased under a cost-plus contract between Fletcher and Tesoro Petroleum Corporation. Tesoro, in turn, had a gasoline supply contract with Gulf. Thus, on a superficial basis, it might appear that Fletcher was not a direct purchaser from Gulf; however, an examination of all the facts supports the district court's finding that "the sale [by Gulf] in substance was to Fletcher." Fletcher had substantial direct dealings with Gulf. Fletcher took delivery of the gasoline directly from Gulf. Gulf established a procedure by which Fletcher transmitted its credit card slips directly to Gulf, which in turn would credit Tesoro's account. Gulf included Fletcher in meetings held with all of Gulf's branded jobbers, and notices of price changes came directly from Gulf to Fletcher, not through Tesoro. Prior to the execution of both the Gulf-Tesoro and the Tesoro-Fletcher contracts, Gulf was informed that Fletcher would be the party receiving and retailing the gasoline, and Gulf representatives investigated Fletcher's station locations, and explained the ramifications of Fletcher's anticipated use of the Gulf brand. The contract between Tesoro and Fletcher provided that Fletcher would pay Gulf's price plus a fixed markup of $.00375 per gallon. When Gulf applied to the DOE to withdraw as a supplier from certain West Coast locations, Gulf referred to its supply obligation to "Tesoro Fletcher."

Section 210(b) of the ESA authorizes suits for overcharges "... against any person ... who is found to have overcharged the plaintiff." This statute has been interpreted as limiting standing in overcharge suits to "direct purchasers." Thus, in *Arnson v. General Motors Corp.*, 377 F.Supp. 209, 211–12 (N.D.Ohio 1974), the court held that a purchaser of an automobile from a dealer did not have standing to sue the manufacturer for alleged overcharges by the manufacturer to the dealer. In reaching this conclusion, however, the court noted "there is no allegation that [the defend-ant] dealt directly with the plaintiff in any manner. Thus absent any privity between plaintiff and defendant, it is apparent that defendant is not a seller within the scope of the Act as it relates to this transaction." 377 F.Supp. at 212. Furthermore, the court in *Arnson* specifically found that there was no agency relationship between the manufacturer and the dealer by which price increases of the manufacturer were automatically passed on to the ultimate consumer. In fact, such price increases were not passed on by the dealer in five percent of the cases. *Id.* at 214. In the present case, on the other hand, there were substantial direct dealings between Gulf and Fletcher, and the price paid by Fletcher was directly tied to the price charged by Gulf through a cost-plus contract. Thus, *Arnson*, relied on by the majority, by no means establishes that Fletcher lacks standing to sue Gulf for overcharges.

Nor does *Palazzo v. Gulf Oil Corp.*, the other case cited by the majority, stand for the proposition that an "indirect" purchaser such as Fletcher has no standing to sue. In *Palazzo*, the plaintiff was an officer and stockholder of the entity which made the purchases from the defendant. Thus, the overcharges by Gulf had no direct and mathematically certain impact on *Palazzo*. Overcharges by Gulf in the present case, on the other hand, had a direct and ascertainable impact on Fletcher, due to the cost-plus contract between Tesoro and Fletcher.

It is the general rule under the antitrust laws that an indirect purchaser has no standing to sue, yet there is an exception to this rule which permits such suits where the plaintiff makes purchases under a cost-plus contract. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707 (1977); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1163–64 (5th Cir.1979). I see no reason why such an exception should not also exist for suits to recover overcharges under section 210(b). This is especially true

in view of Congress' intent that private suits to recover overcharges would serve both remedial and policing functions. To hold that Tesoro, not Fletcher, is the only party which would have standing to sue for these overcharges would not serve any remedial purpose, since Tesoro was not harmed by Gulf's overcharges. Tesoro received its $.00375 per gallon no matter what Gulf charged. Nor would such a holding advance the enforcement purposes of the statute, since Gulf would be permitted to raise the defense that Tesoro passed on all of Gulf's overcharges to Fletcher. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968); *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497 (Em.App.1979); and majority opinion at 809. Tesoro obviously would have no motivation to bring suit for overcharges by Gulf for which it could not recover due to the passing-on defense.

### D. *Remand*

In joining the majority ruling that the case be remanded to reopen the trial to consider Gulf's evidence on the class of purchasers issue, I am satisfied that the court expresses no view on what the proper class of purchasers will ultimately be found to be. I do not understand the majority's statement that the district court's findings were "erroneous as to the class of purchaser base price" (opinion at 805) to be a determination as to the proper class of purchaser.