**98**

EXXON CORPORATION, Mobil Oil Corporation, and Mobil Oil Exploration & Producing Southeast, Inc., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF ENERGY and Donald P. Hodel, Secretary of Energy, Defendants.

In re: the DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION Litigation, M.D.L. 378.

Nos. 5–103, 10–51.

Temporary Emergency Court of Appeals.

Argued May 10, 1984.

Decided July 6, 1984.

As Corrected Aug. 15, 1984.

Certiorari Denied Dec. 3, 1984.
See 105 S.Ct. 576.

Keith A. Jones, Fulbright & Jaworski, Washington, D.C., with whom M.W. Parse, Jr., Jerry E. Smith and A. Frank Koury, of the same firm, Edward de la Garza, Houston, Tex., R. Bruce McLean, Daniel Joseph and David A. Holzworth, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., and William C. Streets, Mark J. Forsch, Houston, Tex. and Gail F. Schulz, Fairfax, Va., were on brief, for plaintiffs in No. 5–103.

Warren Christopher, O'Melveny & Myers, Washington, D.C., with whom Carl R. Schenker, Jr., Aaron S. Bayer and Jacob M. Lewis, of the same firm, Washington, D.C., and Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., were on brief, for plaintiffs in No. 10–51.

Larry P. Ellsworth, Assistant Gen. Counsel, Dept. of Energy, Washington, D.C., with whom Thomas C. Newkirk, Don W. Crockett, David A. Engels, Marcia Sowles and John L. Gurney, Dept. of Energy, Richard K. Willard, Acting Asst. Atty. Gen., and Anthony J. Steinmeyer and Douglas Letter, Dept. of Justice, Washington, D.C., were on brief, for defendants in Nos. 5–103 and 10–51.

Andrew P. Miller, Dickstein, Shapiro & Morin, Washington, D.C., with whom Stephan G. Wielgoz, of the same firm, James F. Flug and Paula Dinerstein, Lobel, Novins & Lamont, Bernard Nash and Edward G. Modell, Blum & Nash, Washington, D.C., David Frohnmayer, Atty. Gen. of Oregon, Salem, Or., Irving I. Kimmelman, Atty. Gen. of New Jersey, Trenton, N.J., Francis X. Bellotti, Atty. Gen. of Massachusetts, Boston, Mass., and Travis Medlock, Atty. Gen. of South Carolina, Columbia, S.C., were on brief for intervenors States in No. 10–51.

Kathleen O. Argiropoulos, Air Transport Ass'n of America, Washington, D.C., with whom Richard T. Williams, Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., were on brief for intervenor Air Transport Ass'n of America, in No. 10–51.

Harold E. Kohn, Kohn, Savett, Marion & Graf, Philadelphia, Pa., with whom Joseph C. Kohn, Philadelphia, Pa., of the same firm, Alexander B. Mitchell, II, Sargent, Klenda, Haag & Mitchell, Wichita, Kan., Philip P. Kalodner, and Lee Ann Glanton, Philadelphia, Pa., were on brief, for intervenors Geraldine H. Sweeney, RJG Cab, Inc., Nat. Freight, Inc. and Philadelphia Elec. Co. in No. 10–51.

Before CHRISTENSEN, WILLIAM H. BECKER, and WESLEY E. BROWN, Judges.

WILLIAM H. BECKER, Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT *

### Nature of Actions and Original Jurisdiction

These are two consolidated actions, of which this Court has original jurisdiction

* The following abbreviations and shortened titles are used herein: EPAA for Emergency Petrole-

under § 211(c) of the Economic Stabilization Act of 1970 found in 12 U.S.C. § 1904 Note, and incorporated in § 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), P.L. 93–159, 15 U.S.C. § 754(a)(1) as amended by the Energy Policy and Conservation Act (EPCA), P.L. 94–163, 15 U.S.C. § 754.

Original jurisdiction of each of these consolidated actions was acquired when the separate District Courts determined that, in an action pending therein, a substantial Constitutional issue existed, and certified that issue to this Court. The separate issues so certified by the separate District Courts are substantially the same. The certificates by the District Courts are set out hereinafter.

### A. *The Parties*

Because this Court has original jurisdiction in these two consolidated actions, the parties in each action will be designated as plaintiffs and defendants, rather than appellants and appellees. The numbers, styles and parties in these two actions are as follows:

No. 5–103.

*Exxon Corporation, et al.*

v.

*United States Department of Energy, et al.*

On Certification from the Northern District of Texas

No. (N.D.Tex.) CA–3–75–0836–W.

*Plaintiffs.*

The remaining plaintiffs in this original action (consolidated) are the following parties:

Exxon Corporation

Mobil Oil Corporation

Mobil Oil Exploration & Producing Southeast, Inc.

Dorchester Gas Producing Company and Dorchester Gas Processing Company, originally plaintiffs in the District Court, have settled their controversy with the Department of Energy and are not parties to this proceeding.

*Defendants.*

The defendants in this original action are as follows:

United States Department of Energy

Donald P. Hodel, Secretary of Energy.

No. 10–51.

*In Re: The Department of Energy Stripper Well Exemption Litigation,* M.D.L. No. 378.

On Certification from the District of Kansas.

This is multidistrict civil litigation in which the parties are listed as follows:

*Plaintiffs.*

Energy Reserves Group, Inc.
Suburban Propane Gas Corporation
Marathon Oil Company
Sklar & Phillips Oil Company
Sierra Petroleum Co., Inc.
Braden-Zenith, Inc.
Mobil Oil Corporation
Mobil Producing Texas & New Mexico, Inc.
Willie Ansley Bryson
Stelbar Oil Corporation, Inc.

um Allocation Act; EPCA for Energy Policy and Conservation Act; No. 5–103 for *Exxon Corporation, et al. v. United States Department of Energy, et al.;* No. 10–51 for *In Re: The Department of Energy Stripper Well Exemption Litigation;* Exxon for Exxon Corporation; Mobil for Mobil Oil Corporation, and Mobil Oil Exploration & Producing Southeast, Inc.; *Chadha* for *Immigration and Naturalization Service v. Chadha; Dyke* for *Gulf Oil Corporation v. Dyke, et al.;* DOE for United States Department of Energy; USCCAN for U.S.Code, Congressional and Ad-

ministrative News; Bruff and Gellhorn for Bruff and Gellhorn, *Congressional Control of Administrative Regulation: A Study of Legislative Vetoes; Chevron* for *Chevron Oil Co. v. Huson; Northern Pipeline* for *Northern Pipeline Construction Co. v. Marathon Pipe Line Company;* Breyer for Breyer, *The Legislative Veto After Chadha;* and *Annotation* for *Annotation: United States Supreme Court Views as to Retroactive Effect of Its Own Decisions Announcing New Rules.*

The Standard Oil Company, an Ohio Corporation

Theo M. Glenn, Jr.

Eleanor E. Glenn

Robert Dale Brandenburg

Texaco Inc., a Delaware Corporation

Aminoil USA, Inc.

Continental Oil Co., Inc. (Conoco)

Sun Exploration and Production Co.

Otis C. Peavey

Everal A. Peavey

Gladys G. Peavey

Ronald J. Peavey

Kenneth Wellbrock

Nora C. Binder

Fred J. Jorgensen

Arlene M. Wolfe

Dora J. Johnson

Robert F. Johnson

Marilyn J. Johnson

Howard Stout, Co-Trustee of the Charles S. Page Trust

Lorena Houlton, Co-Trustee of the Charles S. Page Trust

Mary E. Hall, Co-Trustee of the Charles S. Page Trust

Gulf Oil Corporation

Robert E. Davis

Energy Consumers and Producers Association, Inc. (formerly Oklahoma Association of Energy Consumers and Producers)

Ruthven, Inc.

Pioneer Operations Company, Inc.

George R. Jones

Rex Archer

T.B. Wilcox, III

Wico Oil Company

Jack Fena

James Tasheff

Robert G. Braden

National Cooperative Refinery Association

Estate of Martin Wunderlich

Estate of Charles F. Curry

Guy E. Stanley, Jr.

J.R. Dougherty

John B. Dougherty

Estate of Milton McGreevy

Herndon Drilling Company

Rhude & Fryberger, Inc.

Petroleum Management, Inc.

Atlantic Richfield Company

W.R. Murfin d/b/a Murfin Drilling Company

Champlin Petroleum Company

Exxon Corporation

Hunt Oil Company

Crystal Oil Company

Ira Thomas May

Muskegon Development Company

Paul B. Fletcher, Sr.

Anadarko Production Company

IU International Oil & Gas, Inc.

Wood Oil Co.

Dan Wallace d/b/a Columbus Oil Co.

Will I. Lewis Enterprises, Inc.

Jimmie Austin d/b/a Austin Drilling Company

Santa Fe Energy Company

George G. Anderman

Donald R. Kirby

Patricia Anne Leonard

Mary Kay Harrington

A.F. McMillan

Zula McMillan

Farmers Crude Production Co. (formerly Farmers Petroleum Cooperative, Inc.)

William C. Kirkwood d/b/a Kirkwood Oil and Gas Company

Petroleum Corporation of Texas

*Defendants.*

United States Department of Energy

Secretary of the United States Department of Energy

*Intervenors.*

Total Petroleum, Inc.

Tenneco Oil Company

Pennzoil Company

Tosco Corporation

Ashland Oil, Inc.

Texas City Refining, Inc.

American Independent Refiners Association (formerly American Petroleum Refiners Association)

Chevron U.S.A., Inc.
Farmland Industries, Inc.
Shell Oil Company
The State of Michigan
The State of Alabama
The State of California
The State of Arkansas
The State of Kansas
The State of Delaware
The State of Iowa
The State of North Dakota
The State of Rhode Island
The State of Texas
The Commonwealth of Virginia
The State of West Virginia
The State of Mississippi
The State of Montana
The State of Minnesota
The State of Colorado
The Commonwealth of Pennsylvania
The State of Georgia
The State of South Carolina
The State of Vermont
The State of Nebraska
The State of North Carolina
The State of Illinois
The State of Ohio
The State of South Dakota
The State of Wisconsin
The State of Oregon
The State of Maryland
The State of New Jersey
The State of Tennessee
The State of Nevada
The State of Hawaii
The State of New Mexico
The Commonwealth of Puerto Rico
The Territory of Guam
The U.S. Virgin Islands
The District of Columbia
The State of New York
The Commonwealth of Massachusetts
The State of Connecticut
The State of New Hampshire
The State of Maine
The State of Louisiana
The State of Utah
The State of Idaho

The State of Indiana
The State of Wyoming
National Freight, Inc.
Philadelphia Electric Co.
Payne 22, Inc.
Anthony Monaco
Rex Shipley
Robert Sharo
George Theodore
Harvey Hatfield
Richard Vielhaber
Nicholas Peto
National Oil Jobbers Council
Geraldine H. Sweeney
RJG Cab, Inc.
Air Transport Association of America
Virginia Electric and Power Company
The Jobbers' Group

B. *Certificates of the District Courts*

The material parts of the determinations and certificates of the District Courts follow:

"*In No. 5–103 by United States District Court for the Northern District of Texas.*

"Pursuant to section 211(c) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, the court hereby certifies to the Temporary Emergency Court of Appeals the following substantial constitutional issue raised by plaintiff Exxon Corporation in its Supplemental Motion for Summary Judgment:

"Whether the Emergency Petroleum Allocation Act of 1973 and the Energy Policy and Conservation Act are unconstitutional under *Immigration & Naturalization Service v. Chadha* [—— U.S. ——], 103 S.Ct. 2764 [77 L.Ed.2d 317] (1983), in that they contain unconstitutional one-house legislative veto provisions that are not severable from the remainder of those statutes, thereby rendering void the regulations promulgated pursuant thereto."

(Style, title, words, date and signature omitted.)

"*In No. 10–51 by the United States District Court for the District of Kansas.*

"On November 14, 1983, the plaintiffs moved to certify three constitutional issues to TECA, to vacate the referral of factfinding to the OHA, and to release the escrowed funds. The three constitutional issues are stated by the plaintiffs as follows:

"1) Whether the Emergency Petroleum Allocation Act, as amended, must be declared unconstitutional, *ab initio,* because it contains an invalid and inseverable one-house legislative veto provision that was twice utilized to the detriment of plaintiffs.

"2) Whether the Oil Pricing Policy added as section 8 to the Emergency Petroleum Allocation Act by section 401 of the Energy Policy and Conservation Act must be declared unconstitutional, *ab initio,* because it contains three invalid and inseverable one-house legislative veto provisions and imposed price controls to the detriment of plaintiffs.

"3) Whether MDL No. 378 must be dismissed for lack of subject matter jurisdiction in view of the constitutional invalidity of the Emergency Petroleum Allocation Act, as amended, and section 401 of the Energy Policy and Conservation Act.

\*　　\*　　\*　　\*　　\*　　\*

"IT IS THEREFORE ORDERED that the three constitutional issues raised by the plaintiffs and set out verbatim in this Memorandum and Order, *supra* p. 4 (quoted above), be certified to the Temporary Emergency Court of Appeals (578 F.Supp. 586).

"IT IS FURTHER ORDERED that the plaintiffs' motions to vacate the referral of factfinding to the OHA and to release the escrowed funds be held in abeyance pending TECA's resolution of the constitutional issues.

"IT IS FURTHER ORDERED that OHA continue uninterrupted with its factfinding mission.

"IT IS FURTHER ORDERED that this Court retain jurisdiction over this case and over the escrowed frund [sic] to the maximum extent consistent with the certification of constitutional issues to TECA." (Words in parentheses added. Style, title, words, date and signature omitted.)

### C.  *Contentions of Parties*
### *Plaintiffs' Contentions in No. 5–103.*

In No. 5–103 the contentions of Plaintiffs Exxon Corporation (Exxon), Mobil Oil Corporation, and Mobil Oil Exploration & Producing Southeast, Inc. (Mobil) in their joint brief and joint reply brief are as follows:

a.  Exxon and Mobil have standing to challenge the EPAA and the EPCA.

b.  The Constitutional principle announced in *Immigration and Naturalization Service v. Chadha (Chadha),* 462 U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), is not limited to legislative veto provisions enacted after the date of decision.

c.  The EPAA, both as originally enacted and as amended by Title IV of the EPCA, is unconstitutional in its entirety because of the inclusion of inseverable legislative veto provisions.

1.  Congress would not have conferred decontrol authority on the President without retaining a legislative veto because:

(a) Congress' central purpose in enacting the EPAA was to deprive President Nixon of his unchecked discretion over whether to impose allocation controls, and

(b) Congress' central purpose in enacting the EPCA was to prevent President Ford from carrying out his announced intention of lifting allocation and price controls.

2.  The inseverability of the legislative veto provisions requires invalidation of the entire EPAA both as originally enacted and as amended by Title IV of the EPCA.

(a) Decontrol authority was inseverable from the remainder of the EPAA and Title IV of the EPCA because de-

control authority was a functionally integral part of the overall statutory scheme and because decontrol authority was a necessary ingredient of the political compromise leading to enactment.

(b) Preservation of the regulatory program after *Chadha* cannot be rationalized on other grounds.

d. The defendants' threshold contentions regarding standing and retroactivity are insubstantial.

1. Exxon and Mobil have standing.

2. The rule announced in *Chadha* is retroactive.

e. The legislative veto provisions in the EPAA and the EPCA are not severable from the statutory program of mandatory price controls.

1. This Court's decision in *Gulf Oil Corporation v. Dyke, et al. (Dyke)*, 734 F.2d 797 (TECA Nos. 9–80, 9–81, April 17, 1984), does not dispose of this case.

2. The defendants rely upon an incorrect test of severability.

3. The EPAA contained no implicit severability clause.

4. The decision-making structure of the EPAA and the EPCA was Constitutionally tainted by the presence of a mechanism for legislative veto.

### Plaintiffs' Contentions in No. 10–51.

Plaintiffs in No. 10–51 (listed elsewhere) filed a joint brief and a joint reply brief. In those briefs their contentions are as follows:

a. The EPAA and the EPCA are unconstitutional *in toto* because the legislative veto provisions are inseverable, and DOE's price control regulations therefore are void.

1. Severance is impermissible as to functionally integral provisions of compromise legislation which were necessary to procure passage by Congress or signature by the President.

2. The EPAA would not have been enacted in the same form without its invalid provisions.

3. The EPCA would not have been enacted in the same form without its invalid provisions.

b. Even assuming that the legislative veto provisions of the EPAA and the EPCA are severable, DOE's price control regulations cannot Constitutionally be enforced.

1. If DOE's regulations are to be enforced at all, effect must be given to unconstitutionally vetoed decontrol amendments.

2. DOE's price control regulations are unconstitutional because they were pervasively tainted by the veto power reserved to, and used by, Congress.

c. There are no procedural bars to relief.

### Intervenors' Contentions in No. 10–51.

In No. 10–51 the intervenors States filed a joint brief. In this brief their contentions are as follows:

a. This Court's decision in *Dyke, supra*, holding the legislative veto to be severable from the remainder of the EPAA and EPCA, is dispositive of this case.

b. Because the President's decontrol proposals were without effect, plaintiffs have not suffered any injury.

1. Even in the absence of the Congressional vetoes, the decontrol plans were not capable of taking effect without further legislation.

2. Congressional enactments subsequent to the last exercise of a legislative veto retroactively and validly rejected the decontrol proposals in issue.

c. The existence of the legislative veto provisions did not "taint" the regulations.

d. Even if, *arguendo*, *Chadha* mandated a halt to price control enforcement, that decision should not be retroactively applied.

In No. 10–51 the intervenor Air Transport Association of America filed a brief. In this brief its contentions are as follows:

a. Plaintiffs are foreclosed by F.R. Civ.P. 60(b) and by waiver from pursuit of this appeal.

b. Plaintiffs lack standing to challenge the legislative veto provisions of the EPAA and EPCA.

c. The substantive provisions of the EPAA and the EPCA can and should be severed from the provisions for a one-House legislative veto.

d. Plaintiffs seek an improper and unduly broad remedy.

In No. 10–51 the intervenors Geraldine H. Sweeney, RJG Cab, Inc., National Freight, Inc. and Philadelphia Electric Company filed a joint brief. In this brief their contentions are as follows:

a. Consistent with the intent of Congress both the Presidential decontrol authority and the legislative veto should be severed from the statutes.

b. Plaintiffs' argument that the critical test is not the Congressional intent but whether Congress could have passed the EPAA and EPCA over the President's opposition is without merit.

1. There is no real evidence either that the President would have vetoed the EPAA and EPCA without presidential decontrol (subject to legislative veto) provisions, or, that had he done so, Congress would have been unable to override his veto.

2. There is no legal authority for plaintiffs' position that a determination of severance be based on speculation as to what Congress could have done in the face of presidential veto.

c. Even if the legislative vetoes alone were severed from the statutes, plaintiffs could not benefit from the two crude oil phase-out amendments actually proposed nor from those which might have been proposed.

1. The two phase-out crude oil amendments were null and void *ab initio* since they were not within the President's statutory authority and the President agreed retroactively to the elimination of the "amendments" from the regulatory scheme, therefore plaintiffs were not injured by either of the legislative vetoes.

2. Even if the 30-month decontrol provision were to be given effect, it would be only for the period from July 25 to September 1, 1975.

3. No effect can be given to phase-out amendments which were never proposed to the Congress.

4. Plaintiffs are barred by laches from seeking now to implement decontrol measures vetoed in July, 1975.

d. The challenge to the legislative veto provides plaintiffs no standing to challenge the mandatory price regulations since they were not subject to the legislative veto.

### Defendants' Contentions In Nos. 5–103 and 10–51.

In consolidated actions Nos. 5–103 and 10–51 defendants United States Department of Energy and Donald P. Hodel, Secretary of Energy, filed a single joint brief and a single reply brief. In those briefs their contentions are as follows:

a. The legislative veto provisions are severable from the EPAA and EPCA.

b. Neither the EPAA and EPCA nor the underlying price control regulations should be retroactively invalidated.

1. There is no justification for declaring the EPAA and EPCA void *ab initio*.

(a) The *Chadha* ruling is one of first impression.

(b) Retroactive invalidation of the EPAA and the mandatory pricing regulations would not further the purpose of the Supreme Court's holding in *Chadha*.

(c) Retroactive invalidation of the EPAA would be inequitable.

2. The mandatory petroleum pricing regulations are not unconstitutionally "tainted" and should not be retroactively modified by this Court.

(a) Plaintiffs lack standing to raise their speculative argument.

(b) Plaintiffs' argument that the mere existence of the legislative veto "chilled" the President's actions is rank speculation unsupported by the record.

(c) This Court should not retroactively modify the price control regulations.

D. *Legislative History and Statutory Provisions of the "Emergency Petroleum Allocation Act of 1973," Including the One-House Veto of § 4(g)(2)*

In 1973, the 93rd Congress, First Session, found that there was a National shortage of crude oil and actual or imminent shortages of refined petroleum products. Early in 1973 that Congress, by the "Economic Stabilization Act Amendments of 1973" had authorized, but did not require, the President to order mandatory allocations of gasoline and other petroleum products for purposes including the assurance of distribution thereof to meet the essential needs of various sections of the Nation. Instead of imposing a program of mandatory allocation of those products, the President decided to rely on a voluntary program, announced May 10, 1973. This voluntary program encouraged the major companies to share their supplies of those products with their competitors. Later in 1973 the 93rd Congress, First Session, found that the voluntary program had failed and was "doomed to even greater failures." These findings were recorded in House Report No. 93–531, adopted in the Report No. 93–628 of the Committee of Conference of the House and the Senate. 2 U.S. Code, Congressional and Administrative News (USCCAN), 93rd Congress, First Session, (House Report No. 93–531) 2582 at pages 2583, 2588, (Conference Report No. 93–628) 2688.

In November 1973, because of the existing emergency, growing in intensity, that Congress with the approval of the President enacted into law the mandatory Emergency Petroleum Allocation Act of 1973, authorizing and directing the President to adopt within 10 days, and to implement within 15 days thereafter a program for the mandatory allocation (and pricing) of crude oil, residual and refined petroleum products in the manner, and for the purposes, defined in the EPAA, which became effective November 27, 1973. P.L. 93–159, 87 Stat. 627, 15 U.S.C. § 751, *et seq.*

### The One-House Veto.

The EPAA contained in § 4(g)(2) authority for Presidential proposals of exemptions of crude oil and petroleum products and for a "one-House" veto thereof in the following provision:

"(2) If at any time after the date of enactment of this Act the President finds that application of the regulation under subsection (a) to crude oil, residual fuel oil, or a refined petroleum product is not necessary to carry out this Act, that there is no shortage of such oil or product, and that exempting such oil or product from such regulation will not have an adverse impact on the supply of any other oil or refined petroleum products subject to this Act, he may prescribe an amendment to the regulation under subsection (a) *exempting such oil or product from such regulation for a period of not more than ninety days.* The President shall submit any such amendment and any such findings to the Congress. An amendment under this paragraph may not exempt more than one oil or one product. Such an amendment shall take effect on a date specified in the amendment, but in no case sooner than the close of the earliest period which begins after the submission of such amendment to the Congress and which includes at least five days during which the House was in session and at least five days during which the Senate was in session; except that such amendment shall not take effect if before the expiration of such period either House of Congress approves a resolution of that House stating in substance that such House disapproves such amendment." (Emphasis added.)

E. *Legislative History and Statutory Provisions of the Energy Policy and Conservation Act, Including the One-House Veto of §§ 551 and 552*

In December 1975, because of the expiration of the mandatory program of the EPAA, growing shortages of crude oil and refined petroleum products, interruption of imported crude oil and petroleum products by the Arab embargo, the excess of National natural gas consumption over discoveries beginning in 1968, and experience under the mandatory program of the EPAA, the 94th Congress, First Session, after temporary extension of the EPAA, enacted and the President approved the Energy Policy and Conservation Act (EPCA), which became effective December 22, 1975. P.L. 94–163, 89 Stat. 871, 42 U.S.C. § 6201, Note.

The relevant legislative history of the EPCA is recorded in House Report 94–340, Senate Conference Report No. 94–516, including the Joint Explanatory Statement of the Committee of Conference. 2 USCCAN, 94th Congress, First Session, (House Report) 1762, (Portion of Senate Conference Report No. 94–516, containing Joint Explanatory Statement of the Committee of Conference) 1956.

Among other things, the EPCA in Title IV amended and extended the program of the EPAA and converted the EPAA from a mandatory authority to a standby authority to permit the President to exempt an oil or product from regulation, or to gradually and selectively exempt an oil or a product from all or some control by allocation or price. To accomplish these purposes the EPAA was transformed from a temporary to a permanent law in conjunction with the conversion to a standby authority, with power in the President to reimpose controls on an exempted oil or product. The "one-House" veto, § 4(g)(2) of the EPAA was amended and expanded by the EPCA.

The portions of the EPAA and EPCA under critical review in these actions are the provisions providing for Congressional review, authorizing the "one-House" veto of the proposals of the President to exercise his authority to exempt for a limited time, an oil or product from regulation wholly, selectively, or in a phased manner. An exercise of this authority by an "energy action" of the President amending the mandatory regulations was provided. 2 USCCAN, 94th Congress, First Session, *supra,* at pages 1818, 2058.

The Congressional review provisions of the EPCA were those contained in the House Bill adopted by the Committee of Conference. In § 401 of the EPCA the President was authorized to report to Congress on February 15, 1977, and at other times, and could submit an "energy action" subject to § 551 of the EPCA. Section 551 (and associated § 552) provided for the Congressional review by a "one-House" veto now found to be unconstitutional in the *Chadha* case, *supra.*

The critical provisions, § 551 and § 552 of the EPCA, are as follows:

"Sec. 551. (a) For purposes of this section, the term 'energy action' means any matter required to be transmitted, or submitted to the Congress in accordance with the procedures of this section.

"(b) The President shall transmit any energy action (bearing an identification number) to both Houses of Congress on the same day. If both Houses are not in session on the day any energy action is received by the appropriate officers of each House, for purposes of this section such energy action shall be deemed to have been transmitted on the first succeeding day on which both Houses are in session.

"(c)(1) Except as provided in paragraph (2) of this subsection, if energy action is transmitted to the Houses of Congress, such action shall take effect at the end of the first period of 15 calendar days of continuous session of Congress after the date on which such action is transmitted to such Houses, unless between the date of transmittal and the end of such 15-day period, either House passes a resolution stating in substance that such House does not favor such action.

"(2) An energy action described in paragraph (1) may take effect prior to the expiration of the 15-calendar-day period after the date on which such action is transmitted, if each House of Congress approves a resolution affirmatively stating in substance that such House does not object to such action.

"(d) For the purpose of subsection (c) of this section—

"(1) continuity of session is broken only by an adjournment of Congress sine die; and

"(2) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of the 15-calendar-day period.

"(e) Under provisions contained in an energy action, a provision of such an action may take effect on a date later than the date on which such action otherwise takes effect pursuant to the provisions of this section.

"(f)(1) This subsection is enacted by Congress—

"(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such it is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraph (2) of this subsection; and it supersedes other rules only to the extent that it is inconsistent therewith; and

"(B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner and to the same extent as in the case of any other rule of the House.

"(2) For purposes of this subsection, the term 'resolution' means only a resolution of either House of Congress described in subparagraph (A) or (B) of this paragraph.

"(A) A resolution the matter after the resolving clause of which is as follows: 'That the _____ does not object to the energy action numbered _____ submitted to the Congress on _____, 19__.', the first blank space therein being filled with the name of the resolving House and the other blank spaces being appropriately filled; but does not include a resolution which specifies more than one energy action.

"(B) A resolution the matter after the resolving clause of wh.ch is as follows: 'That the _____ does not favor the energy action numbered _____ transmitted to Congress on _____, 19__.', the first blank space therein being filled with the name of the resolving House and the other blank spaces therein being appropriately filled; but does not include a resolution which specifies more than one ene·gy action.

"(3) A resolution once introduced with respect to an energy action shall immediately be referred to a committee (and all resolutions with respect to the same plan shall be referred to the same committee) by the President of the Senate or the Speaker of the House of Representatives, as the case may be.

"(4)(A) If the committee to which a resolution with respect to an energy action has been referred has not reported it at the end of 5 calendar days after its referral, it shall be in order to move either to discharge the committee from further consideration of such resolution or to discharge the committee from further consideration of any other resolution with respect to such energy action which has been referred to the committee.

"(B) A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported a resolution with respect to the same energy action), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

"(C) If the motion to discharge is agreed to or disagreed to, the motion may not be renewed, nor may another motion to discharge the committee be made with respect to any other resolution with respect to the same energy action.

"(5)(A) When the committee has reported, or has been discharged from further consideration of, a resolution, it shall be at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

"(B) Debate on the resolution referred to in subparagraph (A) of this paragraph shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing such resolution. A motion further to limit debate shall not be debatable. An amendment to, or a motion to recommit, the resolution shall not be in order, and it shall not be in order to move to reconsider the vote by which such resolution was agreed to or disagreed to; except that it shall be in order—

"(i) to offer an amendment in the nature of a substitute, consisting of the text of a resolution described in paragraph (2)(A) of this subsection with respect to an energy action, for a resolution described in paragraph (2)(B) of this subsection with respect to the same such action, or

"(ii) to offer an amendment in the nature of a substitute, consisting of the text of a resolution described in paragraph (2)(B) of this subsection with respect to an energy action, for a resolution described in paragraph (2)(A) of this subsection with respect to the same such action.

"The amendments described in clauses (i) and (ii) of this subparagraph shall not be amendable.

"(6)(A) Motions to postpone, made with respect to the discharge from committee, or the consideration of a resolution and motions to proceed to the consideration of other business, shall be decided without debate.

"(B) Appeals from the decision of the Chair relating to the application of the rules of the Senate or the House of Representatives, as the case may be, to the procedure relating to a resolution shall be decided without debate.

"(7) Notwithstanding any of the provisions of this subsection, if a House has approved a resolution with respect to an energy action, then it shall not be in order to consider in that House any other resolution with respect to the same such action.

"Sec. 552. (a) Any contingency plan transmitted to the Congress pursuant to section 201(a)(1) shall bear an identification number and shall be transmitted to both Houses of Congress on the same day and to each House while it is in session.

"(b) No such contingency plan may be considered approved for purposes of section 201(a)(2) of this Act unless between the date of transmittal and the end of the first period of 60 calendar days of continuous session of Congress after the date on which such action is transmitted to such House, each House of Congress passes a resolution described in subsection (d)(2).

"(c) For the purpose of subsection (b) of this section—

"(1) continuity of session is broken only by an adjournment of Congress sine die; and

"(2) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of the 60-calendar-day period.

"(d)(1) This subsection is enacted by Congress—

"(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such it is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraph (2) of this subsection; and it supersedes other

rules only to the extent that it is inconsistent therewith; and

"(B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner and to the same extent as in the case of any other rule of the House.

"(2) For purposes of this subsection, the term 'resolution' means only a resolution of either House of Congress the matter after the resolving clauses of which is as follows: 'That the _____ approves the contingency plan numbered _____ submitted to the Congress on _____, 19___.', the first blank space therein being filled with the name of the resolving House and the other blank spaces being appropriately filled; but does not include a resolution which specifies more than one contingency plan.

"(3) A resolution once introduced with respect to a contingency plan shall immediately be referred to a committee (and all resolutions with respect to the same contingency plan shall be referred to the same committee) by the President of the Senate or the Speaker of the House of Representatives, as the case may be.

"(4)(A) If the committee to which a resolution with respect to a contingency plan has been referred has not reported it at the end of 20 calendar days after its referral, it shall be in order to move either to discharge the committee from further consideration of such resolution or to discharge the committee from further consideration of any other resolution with respect to such contingency plan which has been referred to the committee.

"(B) A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported a resolution with respect to the same contingency plan), and debate thereon shall be limited to not more than 1 hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

"(C) If the motion to discharge is agreed to or disagreed to, the motion may not be renewed, nor may another motion to discharge the committee be made with respect to any other resolution with respect to the same contingency plan.

"(5)(A) When the committee has reported, or has been discharged from further consideration of, a resolution, it shall be at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the notion [sic] shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

"(B) Debate on the resolution referred to in subparagraph (A) of this paragraph shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing such resolution. A motion further to limit debate shall not be debatable. An amendment to, or motion to recommit the resolution shall not be in order, and it shall not be in order to move to reconsider the vote by which such resolution was agreed to or disagreed to.

"(6)(A) Motions to postpone, made with respect to the discharge from committee, or the consideration of a resolution and motions to proceed to the consideration of other business, shall be decided without debate.

"(B) Appeals from the decision of the Chair relating to the application of the rules of the Senate or the House of Representatives, as the case may be, to the procedures relating to a resolution shall be decided without debate."

89 Stat. 965–969, 42 U.S.C. §§ 6421, 6422.

The EPCA in Title IV, Part A amended the EPAA to provide authority and mandatory early adoption by the President of described amendments to the existing regu-

lations on pricing policies adopted pursuant to § 4(a) of the EPAA, and for needed amendments of the regulations under EPAA, at six months' intervals. The amendments to the EPAA in Title IV, Part A of the EPCA also required and authorized the President to submit to Congress on February 15, 1977 a report containing an analysis of the impact of any such amendments to regulations on the National economy and on supplies of crude oil, residual fuel oil and refined petroleum products; and authorized the President to submit any amended regulations that provided for continuation or modification of certain adjustments in the mandatory regulations authorized by § 4(a) of the EPAA as amended. Each of the mandatory and permissive amended regulations proposed by the President was expressly made subject to the "one-House" veto provisions of § 551 of the EPCA.

Provision was made for the expiration of all authorities, including standby authorities, regulations and orders granted by the EPCA or EPAA at midnight, June 30, 1985, with a minor savings clause for undetermined specified pending matters.

F. *The Two Exercises of the One-House Veto in July 1975*

On July 22, 1975 and on July 30, 1975 the House of Representatives, purporting to act under the "one-House" veto provision of § 4(g)(2) of the EPAA, adopted resolutions of disapproval of the plans of the President to exempt crude oil from mandatory control and pricing regulations. The first proposal of the President to be disapproved was for phased decontrol of crude oil over a time span of 30 months. This proposal of the President was disapproved by House Resolution No. 605 adopted July 22, 1975. 121 Cong.Rec. 23960–23984 (July 22, 1975). The veto is described in 40 Fed. Reg. 31741 (1975).

The second plan of the President was for phased decontrol of crude oil over a period of 39 months, with phased small price increases before the 1976 elections, and larger increases thereafter. This plan was disapproved by the House Resolution No. 641

adopted July 30, 1975. 121 Cong.Rec. 25870–25882 (July 30, 1975). The veto is described in 40 Fed.Reg. 34161 (1975). The facts concerning these actions of the House and the President are briefly and accurately summarized from official records in Bruff and Gellhorn, *Congressional Control of Administrative Regulation: A Study of Legislative Vetoes* (Bruff and Gellhorn), 90 *Harvard Law Review* 1369 at pages 1390–1393 (1977).

The parties disagree whether the two plans proposed by the President were in substance authorized by the EPAA because the time spans of phased decontrol in each exceeded 90 days.

In 1975 the controversy between the President and Congress over decontrol of crude oil and other petroleum products was settled by passage of the EPCA by the Congress and approval thereof by the President, effective December 22, 1975.

*I*

*Standing*

██ In the unique circumstances of these cases, in which plaintiffs (and some intervenors) challenge the Constitutionality of the EPAA, the EPCA, all or some of the mandatory regulations authorized thereby, and, impliedly, the limited jurisdiction of this Temporary Emergency Court of Appeals of the United States, we conclude that the standing requirement is met. *Chadha* case, *supra*, 462 U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d at pages 334, 335 (1983); *Dyke* case, *supra*, 734 F.2d 797 (TECA 1984).

The natures of the crude oil, natural gas liquids and other petroleum products of plaintiffs, subject to the challenged statutes and regulations under review do not limit the conclusions of law herein, which extend to all provisions of the EPAA, the EPCA and regulations authorized thereby.

Because of the unique circumstances, and the limited issues in these cases, the conclusions of law hereof are intended to apply only to the issues arising in these

actions under the EPAA, the EPCA and regulations authorized thereby.

In the *Dyke* case, *supra,* this Court held that the appellant and cross-appellee Gulf Oil Corporation had standing to challenge the subject matter jurisdiction of this Court on the contention that "[t]he applicable statutes granting jurisdiction to this Court contain inseverable and unconstitutional legislative veto provisions, the legislation is void and this Court has no jurisdiction over the cross-appeal" of the *Dyke* case, *supra.* We approve the holding of the *Dyke* case, *supra,* on this issue of standing, and conclude further that plaintiffs in these cases have standing to challenge the Constitutionality of the asserted exercises of the "one-House" veto and the authorizations therefor, under the EPAA, the EPCA and the validity of the regulations authorized thereby.

## II

*The Ruling of the Chadha Case Should Not be Applied Retroactively to Invalidate All or Any Part or Parts of the EPAA, the EPCA, or the Regulations Authorized Thereby*

■ The primary issue to be decided in these actions is whether the recent ruling of the Supreme Court of the United States in *Immigration and Naturalization Service v. Chadha, supra,* 462 U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), should be applied retroactively to invalidate all or any part or parts of the EPAA, the EPCA or regulations authorized thereby. If this issue is decided against retroactive application of the ruling in the *Chadha* case, all other secondary contentions of the parties based on the ruling of the *Chadha* case are foreclosed. We conclude that, under controlling decisions of the United States Supreme Court, the ruling of the *Chadha* case should not be applied retroactively to all or any part or parts of the EPAA, the EPCA (including the "one-House" veto provisions thereof), and the regulations authorized thereby. The reasons for this conclusion follow.

■ The controlling recent decisions of the Supreme Court on the issue of retroactivity in these cases are *Chevron Oil Co. v. Huson (Chevron),* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and *Northern Pipeline Construction Co. v. Marathon Pipe Line Company (Northern Pipeline),* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). A summary of the considerations properly bearing on the issue of retroactivity enunciated in the *Chevron* case, *supra,* and in the ruling against retroactivity in the *Northern Pipeline* case, *supra,* are contained in the following quotation from the *Northern Pipeline* case, *supra:*

"Having concluded that the broad grant of jurisdiction to the bankruptcy courts contained in 28 U.S.C. § 1471 (1976 ed., Supp. IV) is unconstitutional, we must now determine whether our holding should be applied retroactively to the effective date of the Act. Our decision in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 30 L.Ed.2d 296, 92 S.Ct. 349 (1971), sets forth the three considerations recognized by our precedents as properly bearing upon the issue of retroactivity. They are, first, whether the holding in question 'decid[ed] an issue of first impression whose resolution was not clearly foreshadowed' by earlier cases, id., at 106, 30 L.Ed.2d 296, 92 S.Ct. 349 [at 355]; second, 'whether retrospective operation will further or retard [the] operation' of the holding in question, id., at 107, 30 L.Ed.2d 296, 92 S.Ct. 349 [at 355]; and third, whether retroactive application 'could produce substantial inequitable results' in individual cases, ibid. In the present case, all of these considerations militate against the retroactive application of our holding today. It is plain that Congress' broad grant of judicial power to non-Art. III bankruptcy judges presents an unprecedented question of interpretation of Art. III. It is equally plain that retroactive application would not further the operation of our holding, and would surely visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts. We

hold, therefore, that our decision today shall apply only prospectively." (Footnotes omitted. 458 U.S. at pages 87, 88, 102 S.Ct. at page 2880, 73 L.Ed.2d at pages 625, 626.)

Applying the three considerations summarized and applied in the *Northern Pipeline* case, *supra*, we find from the legislative history, the statutory provisions of the EPAA and EPCA, the regulations, and the judicially noticed administrative history and judicial decisions of this Court that:

1. The holding of the *Chadha* case, *supra*, decided an issue of first impression whose resolution was not clearly foreshadowed by earlier cases. This finding is supported by the unchallenged findings of the majority and concurring opinions in the *Chadha* case, *supra*, and the findings of many reliable scholarly articles on legal history of which these are examples: Breyer, *The Legislative Veto After Chadha* (Breyer), 72 *Georgetown Law Journal* 785 (1984); and Bruff and Gellhorn, *supra*, 90 *Harvard Law Review* 1369 (1977), noting the Constitutional questions concerning the "one-House" veto based on the separation of powers and bicameralism, and concluding, "whether the legislative veto will founder upon these constitutional objections is unclear." Bruff and Gellhorn, *supra*, 90 *Harvard Law Review* at page 1374.

2. Retrospective operation in these cases of the holding of the *Chadha* case, *supra*, will retard the operation of that holding as surely as retroactive operation of the *Northern Pipeline* holding to the bankruptcy system would have retarded operation of that holding.

3. Retroactive application in these cases of the holding of the *Chadha* case, *supra*, not only could, but would produce substantial inequitable results in these and other cases, because of the pervasive, massive statutory and regulatory applications to the National energy industry since 1973 in closed proceedings that might be reopened and in open pending proceedings and uncompleted transactions, that might be questioned and relitigated under a retroactive applica-

tion. It is no answer to the inequitable results, that could and would result, to support a limited retroactivity that would not apply to closed proceedings and transactions only.

Further, in determining whether in particular circumstances to order retroactive application of a Constitutional rule of law, recently announced by the judiciary, a foremost criterion is the purpose of the newly announced rule, and whether retroactive application will further or retard its operation. The purpose of the new rule in the *Chadha* case, *supra*, holding a "one-House" veto unconstitutional was stated in the words of the Supreme Court, as follows:

"Since it is clear that the action by the House under § 244(c)(2) was not within any of the express constitutional exceptions authorizing one House to act alone, and equally clear that it was an exercise of legislative power, that action was subject to the standards prescribed in Article I. The bicameral requirement, the Presentment Clauses, the President's veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded. To accomplish what has been attempted by one House of Congress in this case requires action in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President." (Footnotes omitted. 462 U.S. at page ——, 103 S.Ct. at page 2787, 77 L.Ed.2d at pages 348, 349.)

The "one-House" veto was an unconstitutional legislative device that first appeared in federal legislation in 1932 and proliferated in numbers through 1982. The purpose of the *Chadha* case was to prevent the

continued use of that legislative veto device. Breyer, *supra,* 72 *Georgetown Law Journal* 785; *Severability of Legislative Veto Provisions: A Policy Analysis* (Note), 97 *Harvard Law Review* 1182 (1984). No retroactive application of the rule of the *Chadha* case to the EPAA, the EPCA or regulations authorized thereby is necessary or desirable to further that purpose. That purpose can be fully achieved without retroactive application of the rule of the *Chadha* case to the EPAA or EPCA or the regulations authorized thereby. *Annotation: United States Supreme Court's Views as to Retroactive Effect of Its Own Decisions Announcing New Rules (Annotation),* 65 L.Ed.2d 1219 at pages 1233, 1235–1237 (1981), and cases cited therein.

From the legislative history of the EPAA and the EPCA we take convincing judicial notice that, prior to the expiration of the mandatory regulations adopted, administered and enforced pursuant to the authority of the EPAA and the EPCA, the reliance placed thereon for ten years before the *Chadha* case extended to every part of the huge essential National and international energy industry, from producers, financiers, refiners, processors, distributors, to direct and indirect purchasers of energy, and the products thereof, including consumers, and extended to nearly every part of the National economy. The resulting effects of the open, as well as closed, large, average and small proceedings and transactions are so numerous that they are uncountable, nearly infinite, immeasurable and irreversible in economic effects and legal rights. The huge numbers of these uncountable transactions include a nearly infinite number of large, average and small transactions in closed proceedings, and a myriad of irreversible uncompleted transactions and pending proceedings, in which uncountable numbers of parties justifiably obeyed the EPAA, the EPCA and regulations authorized thereby in good faith and without questions. To attempt to apply the rule of the *Chadha* case to the nearly infinite number of closed, or to the huge number of uncompleted transactions and pending proceedings, and effects thereof,

would defeat good faith reliance on National laws in these and in future circumstances. See *Annotation, supra,* 65 L.Ed.2d 1219 at pages 1237–1239, and cases therein cited.

Retroactive application of the rule of the *Chadha* case, *supra,* would produce substantive inequitable results by affording an opportunity to litigate or repudiate a nearly infinite number of obligations incurred or performed in good faith, and enforced or enforceable in administrative and judicial proceedings under the authority of the EPAA and the EPCA, the effects of which have been transmitted for more than ten years throughout the National economy. Retroactive application of the rule would cause substantive inequitable results to uncountable parties, and would impose substantial and impossible burdens on the administration of justice, which would be confronted with a nearly uncountable and immeasurable number of claims of a myriad of parties. To reverse the previously declared obligations imposed by the terms of the EPAA, the EPCA and the pervasive mandatory regulations authorized thereby would be impossible. Even if the rule of the *Chadha* case were retroactive only to pending or open proceedings, tasks impossible to perform would be imposed on the administration of justice.

### III

### *Alternate Conclusions of Law if the Rule of the Chadha Case is Held to be Retroactive*

If the *Chadha* case, *supra,* is ultimately held to be retroactive in application to the EPAA and the EPCA, it will be necessary to determine whether the "one-House" veto provisions thereof are severable from the remainder of those Acts. So we make the following alternative conclusions on severability.

### *Severability of the One-House Veto Provisions of the EPAA and the EPCA.*

■ Acting on a challenge to the subject matter jurisdiction of this Court, based on

the contention that the ruling of the *Chadha* case, *supra,* invalidates the whole of the EPAA and the EPCA, this Court has held in a convincing scholarly and sound opinion by Judge Estes that the "one-House" veto provisions of those Acts are severable. *Gulf Oil Corporation v. Dyke, et al. (Dyke), supra,* 734 F.2d 797 (TECA 1984). We follow the ruling of the *Dyke* case and conclude that the "one-House" veto provisions of the EPAA and of the EPCA are severable.

Plaintiffs contend that the ruling of the *Dyke* case did not conclude the question of validity of the regulations authorized by the EPAA and the EPCA. We conclude that the ruling of severability of the *Dyke* case, *supra,* does apply to uphold the validity, on their face, of the regulations authorized by the EPAA and the EPCA. This leaves only the questions whether those regulations are invalid because of additional contentions that they are "tainted" by the "one-House" veto, or rendered invalid because of the two exercises in July 1975 of the "one-House" veto disapproving plans of the President for phased decontrol of crude oil.

We move to rulings on those additional questions.

### The Regulations Authorized by the EPAA and the EPCA are Not Invalid Because of "Taint" by the One-House Veto Provisions.

■ We conclude that the regulations authorized by the EPAA and the EPCA are not "tainted" because: (1) these regulations were confirmed and extended by the enactment of the EPCA by both Houses of Congress and approved by the President, thereby Constitutionally amending and extending the EPAA and the regulations authorized thereby; (2) the records and papers relied on to prove coercive "taint" arising from presence of the "one-House" veto provisions of the EPAA and the EPCA do not establish any illegal, fraudulent or coercive effect on the President; and (3) the plans of the President to decontrol crude oil, disapproved by the House in July

1975, were not plans or amendments to mandatory regulations authorized by the EPAA.

1. The regulations, about which plaintiffs complain, and the authority for their adoption were confirmed and extended in a Constitutional manner by passage of the EPCA by both Houses of Congress and approval thereof by the President in 1975. This followed formal and informal debate, in and out of Congress, confrontation between the President and Congress, repeated and changing analyses of the relevant experience, and enactment of a new impartial law in a manner expected from the separation of powers of the Legislative and Executive Departments by our Constitution. Compare *Clark v. Valeo,* 559 F.2d 642 (C.A.D.C.), *affirmed,* 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977). See *Mapco v. Carter,* 573 F.2d 1268 at page 1278 (TECA), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978), in which the following applies concerning the enactment of the EPAA and amendment by the EPCA under our Constitutional system:

"In our constitutional tripartite system of government, featuring checks and balances between and within the three branches, it is rarely the case, if ever the case, that all branches of the government join in a unanimous, clear statement of policy or meaning of a law that all people unanimously understand and interpret exactly the same way. Frequently, the executive, legislative, and judicial branches disagree about laws and policies. One branch of government acting within its constitutional authority sometimes nullifies or restricts action of another branch. Popular elections are regularly scheduled by the Constitution and laws of the nation and states as opportunities to change laws, policies, and the principal national officers of the legislative and executive branches of the federal government. If the legislative branch declares a clear policy and enacts a law to implement the policy, it may later change that law and policy if it acts

within accepted constitutional limitations. The judicial branch may declare actions of the legislative and executive branches unconstitutional, or interpret such actions contrary to contentions of the officers of the executive or legislative branches.

"The right claimed by plaintiffs is not consistent with these accepted constitutional principles. Even subjectively, the plaintiffs had no constitutional or other right to assume that the federal government or any branch thereof represented prior to December 1975, or made a policy that the permissible prices of 'upper-tier' oil would never be changed or reduced." (Footnote omitted.)

The proper factual and legal conclusions concerning the controversy in 1975 between the President and Congress on decontrol of crude oil were expressed in Bruff and Gellhorn, *supra*, 90 *Harvard Law Review* at page 1392 as follows:

"The agency would go no further; it made no more submissions prior to December 1975, when the enactment of the Energy Policy and Conservation Act of 1975 (EPCA) settled the issue by legislation."

2. The many records, articles and papers, including those of the President, prove no unconstitutional coercive "tainting" of the regulations under the EPAA and EPCA. In 1973, the "one-House" veto had existed for over forty years in various forms without producing a judicial finding of coercion beyond speculation. The President from 1973 to 1975 not only was not coerced, he composed and promulgated the challenged regulations through Executive Departments. He confirmed their need in the energy crisis, accepting the Congressional judgment by signing into law the EPAA and the EPCA. We do not believe that any of the cases cited by plaintiffs in support of their contentions are legally controlling, or factually in point on this contention.

3. The plans of the President to decontrol crude oil disapproved by the House in July 1975 were not authorized amendments of the regulations under the EPAA because they were each effective for over 90 days, and both proposed plans of the President extended beyond the original expiration date of the EPAA. As such they could not be made effective without further legislation enacted by both Houses of Congress and signed by the President or passed over his veto. See § 4(g)(2), quoted above, providing that proposals of the President to exempt oil or a product by amendment to a mandatory regulation shall be "for a period of not more than ninety days."

### FINAL CONCLUSIONS OF LAW

We conclude that the ruling of the *Chadha* case, *supra*, that the "one-House" veto is unconstitutional should not be applied retroactively to the EPAA, the EPCA and to regulations authorized thereby.

In the alternative, we conclude that the "one-House" veto provisions of the EPAA and the EPCA are severable.

Further, in the alternative, we conclude that the regulations authorized by the EPAA and the EPCA are not tainted, coerced and rendered invalid by the "one-House" veto of the EPAA and the EPCA or of either of them.

Further, in the alternative, we conclude that the two proposed plans of the President in 1975 to decontrol crude oil, vetoed by the House of Representatives were not authorized by the EPAA and cannot be retroactively enforced.

Further, as a result of the foregoing conclusions we conclude that neither the above described action (consolidated) in the Northern District of Texas nor the above described actions in the District of Kansas should be dismissed for lack of subject matter jurisdiction because of the ruling in the *Chadha* case, *supra*, that the "one-House" vetoes in the EPAA and EPCA are unconstitutional. A judgment on a separate page is attached.

*JUDGMENT*

For the reasons stated in Findings of Fact and Conclusions of Law filed herewith, it is

ORDERED AND ADJUDGED that the Emergency Petroleum Allocation Act of 1973, the Energy Policy and Conservation Act of 1975, except possibly the "one-House" veto provisions thereof, and all regulations authorized and adopted thereunder, are not affected or rendered invalid in any respect by the ruling that a "one-House" veto is unconstitutional in *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).